Harriet CONRAD, Plaintiff,

v.

**BOARD OF JOHNSON COUNTY COMMISSIONERS, et al., Defendants.**

No. CIV.A.00–2277–DJW.

United States District Court, D. Kansas.

Oct. 15, 2002.

Patrick G. Reavey, Reavey Law LLC, Kansas City, MO, for Harriet Conrad.

Michael M. Shultz, Johnson County Legal Dept., Olathe, KS, for Johnson County Bd. of County Com'r., Johnson County Health Dept.

## MEMORANDUM AND ORDER

WAXSE, United States Magistrate Judge.

This is an employment discrimination action in which Plaintiff Harriet Conrad asserts claims against the Board of Johnson County, Kansas Commissioners and the Johnson County Health Department (collectively referred to as "the County"). Plaintiff alleges the County violated the Americans with Disabilities Act ("ADA")[1] in three different respects. First, she claims the County subjected her to a fitness for duty evaluation and psychiatric testing in violation of the ADA. Second, she alleges the County discriminated against her on the basis of a perceived disability. Third, she claims the County retaliated against her for engaging in conduct protected by the ADA.

Plaintiff also asserts a claim against the County for age discrimination under the Age Discrimination in Employment Act ("ADEA").[2] In addition, she asserts three

---

1. 42 U.S.C. §§ 12111, *et seq.*

2. 29 U.S.C. §§ 621, *et seq.*

state law claims against the County: breach of implied contract, retaliatory discharge, and intentional infliction of emotional distress.

Pursuant to 28 U.S.C. § 636(c)(1), this case has been assigned to the undersigned Magistrate Judge for all further proceedings. The Court issued an Order (doc. 154) on September 30, 2002 summarily granting the County's Motion for Summary Judgment (doc. 81). This Memorandum and Order will set forth the Court's reasons for granting summary judgment in favor of the County.

## I. Facts

In keeping with the standards governing summary judgment, any facts in the parties' briefs not properly supported by the record have not been included in the following statement of facts. In addition, any matters on which the record discloses a genuine dispute of material fact have been construed in Plaintiff's favor. The Court's analysis was made very difficult by both parties' failure to fully comply with D. Kan. Rule 56.1.

After conducting a very time-consuming review of the more than 3,000 pages of materials submitted by the parties, the Court sets forth the following material facts that are uncontroverted, deemed admitted, stipulated to by the parties, or where disputed, viewed in the light most favorable to Plaintiff.

Plaintiff began her employment with the County in February 1995, and she continued to be employed by the County until her termination on March 15, 1999. She was employed as Prenatal Program Manager and Advanced Registered Nurse Practitioner and worked in the Johnson County Health Department ("Health Department"). Plaintiff is an Advanced Registered Nurse Practitioner, Clinical Nurse Specialist.

According to her job description, Plaintiff's primary function was to deliver "advance practice prenatal nursing care" and to provide consultation and education within the technically current standards of practice in order to promote positive pregnancy outcomes for the mother, infant, and family unit, especially among high-risk patients. Plaintiff performed comprehensive physical examinations on pregnant clients in order to assess their health status and the health status of the fetus. In addition, she managed the care of pregnant clients by developing individual, comprehensive plans of care.

The Prenatal Program is contained within the Personal Health Services Division of the Health Department. At all times relevant to this case, the Personal Health Services Division was directed by Martha Hutcheson ("Hutcheson").

Plaintiff reported to Ruth McKenzie ("McKenzie"), who was the Maternal Child Coordinator. McKenzie reported to Hutcheson. Hutcheson, in turn, reported to Debby Sullivan ("Sullivan"), who was the Director of the Health Department.

The parties have stipulated that "[a]ll of the written evaluations in Plaintiff's personnel file show she was meeting or exceeding Defendants' expectations." The most recent evaluation of Plaintiff's job performance was conducted in February 1998. Up until the fall of 1998, Plaintiff either met or exceeded the County's expectations regarding her job performance.

In September 1998, McKenzie counseled Plaintiff about failing to complete sufficient work on protocols for the Prenatal Program, which were required for state accreditation of the program. She also counseled Plaintiff about her inability to stay focused on her work.

On or about November 16, 1998, McKenzie had a conference with Plaintiff and

discussed her concerns about whether Plaintiff was properly performing her program manager responsibilities. McKenzie expressed concern that Plaintiff was spending too much time away from the Mission, Kansas office and that Plaintiff's time sheets reflected she was working too many hours. McKenzie asked Plaintiff not to work after hours late into the evening and asked Plaintiff to stay focused on her program manager responsibilities.

In early January 1999, McKenzie gave Plaintiff a note thanking her for a Christmas gift Plaintiff had given her. After thanking her for the gift, McKenzie stated: "It's great to see how the Prenatal Program has grown in numbers this year. Know it has been very challenging for you with staff changes, but you have done a great job."

On or about January 14, 1999, McKenzie learned of complaints from Plaintiff's subordinates that Plaintiff was keeping them from doing their jobs because of the amount of time she spent discussing the work schedule with them.

On January 15, McKenzie counseled Plaintiff about having spent the entire afternoon of January 13 with only one client, which had contributed to a chaotic clinic. McKenzie instructed Plaintiff to stay focused on her job. McKenzie believed Plaintiff was not spending her time on appropriate job duties.

On January 20, Plaintiff called McKenzie at 5:40 p.m. to express her frustration about a co-worker. McKenzie told Plaintiff she should go home and worry about the problem the next day. Plaintiff did not go home, however, and stayed at work until approximately 12:45 a.m.

Shortly before leaving work, Plaintiff sent an e-mail memo to McKenzie and Hutcheson. The e-mail memo contained a lengthy discussion of various problems in the Health Department. The memo was single spaced and approximately four pages long on paper. The memo set forth Plaintiff's concerns about a certain health management issue and then stated:

Please advise, I am quite concerned about this as you can tell. (not mad or blaming anyone just frustrated and needing some answers/questions and I've felt a lot of "shunting" from this person to that person lately has been in large part responsible for the increased number of hours I've had to spend at work lately ensuring that the things happen that need to get done by "somebody" when "nobody" seems to be the one that is "responsible for that". "Its not my job" frequently becomes "Harriet's job" for lack of anyone else accepting the responsibility to do it, find out who can do it, or even offering to help me to do it.

\* \* \* \* \* \*

I cannot keep up this pace and I cannot cut corners when it means possible jeopardizing a client or making an error or oversight)[sic]. I don't want to be a griper or complainer and I thought this was just a temporary thing but it's going on and on and the "to do" pile is growing and growing. It's no one person or program it's a prevailing "poor morale" type feeling like I just want to put in my time [sic] do my little piece of the work and go home at 5pm everyday.

\* \* \* \* \* \*

I feel like a dump, the final dumping ground.

The e-mail concluded with the following:

Please hear me that I'm not mad at anyone, blaming anyone individual. It's an unbalance in the system that needs correction but where I don't know. I love the Health Department but I[sic] suffering from exhaustion and chronic fatigue and have too much to do to even call in sick and miss a day.

After sending the e-mail memo at 12:43 a.m., she went home. At 9:30 that morning, Plaintiff sent another e-mail memo, this one to the entire staff of the Health Department. The "subject line" of the memo read "freedom." The body of the memo read as follows:

On behalf of every wonderful, caring, dedicated servant of the people at the JCHD (includes everyone, without exception!) and as a gift to Denise Brennan and Ellen Rangel for their combined years of service. I am asking the "force" to release everyone of us from the "chains that bind" and "the walls that keep our Spirits apart."

We NEED each other to reach our shared vision, "health at the Highest Level". A vision we can attain if we are all free to do our personal best.

I believe that we have all the talent, skill, and ability we need to attain this vision! However, it remains "out of our reach" until we ALL as one "release the chains" and "tear down the walls." THE "force" THAT KEEPS U.S. APART, IS ACTUALLY LIKE THE "EMPERORS NEW CLOTHES". THERE'S REAL-LY NOTHING THERE! WE JUST IMAGINE THERE IS UNTIL IT BE-COMES A BELIEF!

When we let go of this belief (the chains) we will be FREE at last to begin to realize our shared dream. We must each accept the reality that no matter how hard we each try in our separate ways, we can not and will not make it happen.

YET! United as ONE we are strong enough to "break down the walls".

SIMPLY, BELIEVE!!!!!!!!!!!!!!!!!!!!!!

As ONE, united, together, close your eyes and tell yourself, "I AM WON-DERFUL! WALLS COME DOWN!!!!!!

Do it mostly for yourself, but also in recognition of these 2 "faithful" and "dedicated" ones, DENISE BRENNAN AND ELLEN RANGEL.

After receiving the two e-mail memos from Plaintiff on January 21, 1999, McKenzie discussed them with Hutcheson, and they both expressed concern about the memos and Plaintiff's behavior. In particular, McKenzie was concerned about Plaintiff's statement that she was suffering from exhaustion and chronic fatigue. McKenzie was also concerned about the language Plaintiff used in the second memo. In addition, McKenzie thought it was inappropriate for Plaintiff to send the memo to the entire staff of the Health Department.

Some time that same morning, McKenzie met with Plaintiff and communicated to Plaintiff her concerns about the two e-mail memos. McKenzie told Plaintiff she was concerned about Plaintiff's behavior and that she seemed to be acting erratically. McKenzie also told Plaintiff it was inappropriate to send the second e-mail to the entire staff. During the meeting, it appeared to McKenzie that Plaintiff was not focusing on the concerns she was expressing.

Later in the day, Plaintiff and other County employees working in the Health Department attended a client care conference called by Hutcheson. Hutcheson called the conference to discuss the care of a pregnant patient who was HIV positive and who had tuberculosis. (The parties, and the Court, will refer to this patient as "Doe" to protect her privacy.) Everyone in attendance at that meeting, other than Plaintiff, was a registered nurse. As noted above, Plaintiff was an Advanced Registered Nurse Practitioner.

At the time of the January 21 meeting, Frances Zampine ("Zampine"), an Infectious Disease Case Manager, and Natalie Adams ("Adams"), the Ryan White HIV Case Manager, were managing Doe's care.

Doe had not been seen by the Prenatal Program since September 1995. Earlier in January, Zampine had spoken to Plaintiff about difficulties she was encountering with Doe. At that time, Zampine asked for Plaintiff's assistance because the Health Department had been unsuccessful in contacting Doe. Zampine was concerned for the welfare of the children and care givers at the daycare facility where Doe worked and wanted to contact Doe to discuss her treatment. Zampine knew Plaintiff had dealt with Doe during a prior pregnancy, and she thought Plaintiff might have some rapport with Doe, which would facilitate communication with her.

At Zampine's request, Plaintiff contacted Doe on January 10. Doe informed Plaintiff that she was in fact pregnant and that she wanted to continue her care with the Health Department. There is nothing in the record to indicate that Plaintiff had any other contact or any professional relationship with Doe between the time Doe was transferred out of the Prenatal Program in September of 1995 and the January 10, 1999 telephone conversation.

Prior to the January 21 client care conference, Plaintiff had reviewed the charts and medical records on Doe and she became concerned about Doe, Doe's unborn child, and the children at the daycare facility where Doe was employed. Plaintiff believed the different programs at the Health Department were not communicating with each other about Doe's care. Plaintiff felt that Doe's treatment, diagnosis and charting, in addition to the Health Department's communication with Doe, were confusing, fragmented, and not in compliance with orders by Doe's doctor.

Plaintiff communicated her concerns to those at the January 21 care conference. The record does not reveal exactly what Plaintiff said at the meeting with regard to those concerns. Plaintiff recommended a certain nursing plan of care, which included Plaintiff coordinating Doe's plan of care and either Plaintiff or an Area Nurse scheduling a personal visit with Doe at her place of employment. Plaintiff proposed that during the personal visit, Doe would be informed of the proposed medical plan, the rationale for the plan, the expected outcome, the risks involved, and the effect of no treatment at all.

Hutcheson proposed a different plan of care for Doe, one which did not involve a personal visit to Doe at her place of employment. Hutcheson's plan called for Doe to be referred back to the care of Adams (the Ryan White HIV Case Manager) for HIV case management.

At the end of the meeting, Hutcheson ultimately decided to refer Doe back to the care of Adams and Plaintiff was instructed not to contact Doe at her place of employment. Plaintiff voiced an objection to Hutcheson's decision to refer Doe back to the care of Adams. The record does not reveal exactly what Plaintiff said in raising her objection. No one else at the meeting, other than Plaintiff, voiced any objection to Hutcheson's decision. Plaintiff objected because she viewed Hutcheson's decision as essentially closing the case on the patient. Plaintiff believed that Hutcheson, who was a Registered Nurse and not an Advanced Registered Nurse Practitioner like Plaintiff, did not have the authority to override Plaintiff's plan of care.

Before leaving the client care conference, Plaintiff stated: "I believe that we need to reach out a hand of compassion to a very troubled, confused, frightened and needy young woman not only for her sake but for the sake of public safety."

According to Plaintiff, Hutcheson acted in an aggressive manner toward her during the meeting. Plaintiff contends Hutcheson acted in such a manner because she had questioned Hutcheson's decision regarding Doe's care. Although Plaintiff

cannot remember what Hutcheson said to her at the meeting, Plaintiff was upset by the way Hutcheson treated her, and Plaintiff felt humiliated, embarrassed, and intimidated.

Following the meeting, Plaintiff went to Sullivan's office to complain about Hutcheson's actions. Plaintiff cried quite a bit when talking to Sullivan. Plaintiff told Sullivan she was "really, really, really" upset. She also told Sullivan that she could not think clearly and that she needed time to think about what to do.

Sullivan had never seen anyone as upset as Plaintiff was during their meeting. Sullivan perceived Plaintiff to be agitated, angry, and unable to control her emotions. She observed that Plaintiff's speech was very rapid and her thoughts scattered. Plaintiff insisted that Hutcheson had to be stopped and that she would be the one to do it. Sullivan perceived Plaintiff's conduct to be an excessive, over-reaction to the meeting with Hutcheson, but nevertheless she tried to comfort Plaintiff. Plaintiff eventually calmed down and was able to return to the clinic to see patients.

On the morning of January 22, Plaintiff called McKenzie from home. McKenzie knew something had happened the night or day before. Plaintiff told McKenzie that after "last night," she was really upset and thought it would be helpful to talk to someone about it. McKenzie was concerned about Plaintiff's ability to do her work because Plaintiff sounded very upset and she seemed unfocused. It was agreed that Plaintiff would take the day off. McKenzie suggested that Plaintiff consider using the County's Employee Assistance Program ("EAP"). Plaintiff asked McKenzie to make an appointment for her with the EAP.

Later that same day, Plaintiff met with Sharon Glass, Ph.D., a psychologist who was the Facilities Coordinator of the EAP at Saint Luke's–Shawnee Mission Health System. Dr. Glass was not employed by the County. The following Monday, January 25, 1999, Plaintiff did not go into work.

At some point in time during this course of events, McKenzie discussed Plaintiff's behavior with Rhonda Baugus ("Baugus"). Baugus was the Employment Manager in the County's Human and Organizational Development Department (also referred to as the Department of Human Resources). After McKenzie discussed the matter with her superiors, i.e., Hutcheson and Sullivan, and with Baugus, it was decided Plaintiff should receive a written warning. They decided that her conduct was severe enough for the warning to be deemed a "Second Warning" under the County's Disciplinary Action Policy. (As discussed later in more detail, the County's Disciplinary Action Policy provides for an "Oral Warning," which is typically followed by a "First Warning" and then a "Second Warning." The First and Second Warnings are written warnings.)

On Tuesday, January 26, McKenzie and Baugus met with Plaintiff to discuss McKenzie's concerns that Plaintiff's work performance over the last three months was declining. At the meeting, McKenzie told Plaintiff she believed Plaintiff was exhibiting erratic behavior. McKenzie also told Plaintiff she was being given a "Second Warning." McKenzie explained that she considered the counseling Plaintiff had received in the fall of 1998 to be Plaintiff's "First Warning."

Plaintiff strongly voiced her objections to McKenzie's conclusion that she was exhibiting erratic behavior which was affecting her ability to do her job. In addition, Plaintiff told McKenzie and Baugus it was discriminatory for them to accuse her of erratic behavior and to ignore that same type of behavior in others, and, in particular, in Hutcheson. At no time during this meeting did either McKenzie or Baugus

ask Plaintiff whether she was suffering from any disability or physical or mental impairment.

At some point in time on the 26th, McKenzie and Baugus discussed whether Plaintiff should be allowed to return to work because Plaintiff was behaving erratically and not focusing on her work. They decided that Plaintiff should be suspended, *i.e.*, placed on administrative leave. The record is not clear as to when this discussion took place or when the actual decision to suspend Plaintiff was made. Resolving this factual issue in favor of Plaintiff, the Court will assume that the discussion and suspension decision were both made some time after Plaintiff objected to McKenzie's conclusion that Plaintiff was acting erratically and some time after Plaintiff complained that it was discriminatory for them to accuse her of erratic behavior and to ignore that same type of behavior in Hutcheson.

McKenzie and Baugus informed Plaintiff that she was being placed on administrative leave and requested that she leave the Health Department. Plaintiff objected because she had patients waiting. McKenzie and Baugus advised Plaintiff that if she did not leave, law enforcement would be called. Plaintiff responded that she would be willing to leave, but she insisted a witness be present. Baugus called Dr. Glass at the EAP and asked her to act as a witness. Dr. Glass came to the Health Department, where she met with Plaintiff for almost two hours in order to, as Dr. Glass phrased it, "assist in defusing the crisis." Dr. Glass also referred to her meeting with Plaintiff as an "on-site crisis intervention."

During her meeting with Dr. Glass, Plaintiff insisted she be allowed to talk with the Director of the Human and Organizational Development Department, and Plaintiff indicated that she would not leave unless and until the Director ordered her to do so. After talking with the Director, Plaintiff agreed to leave. Plaintiff left the building at 6 p.m., several hours after first meeting with Dr. Glass. She was given a memo from McKenzie indicating that she was being placed on administrative leave, with pay, beginning that afternoon at 2:30 p.m. and continuing through the next day, Wednesday, January 27.

During the course of her discussions with Plaintiff on the 26th, McKenzie became even more concerned about Plaintiff because she perceived Plaintiff was unable to focus on the issues she and Baugus were raising. Plaintiff refused to discuss the performance-related issues and she appeared confused. Plaintiff's behavior caused McKenzie to question whether Plaintiff was capable of performing her Prenatal Program Manager duties.

The warning Plaintiff was given at the January 26 meeting was memorialized in a document the following day. The document was a form document entitled "Second Warning," and was signed by McKenzie (as Plaintiff's supervisor) and Baugus (as a witness) on the 27th. In the section entitled, "Description of Problem," the warning stated:

> Erratic behaviors as evidenced by (1) inappropriate e-mail messages, (2) inability to focus on specific program, inability or unwillingness to complete assigned tasks, i.e. see clients as scheduled, (3) working hours outside of regularly scheduled hours.

The warning contained the following recommendation and timetable for taking corrective action:

> *Supervisor's Recommendation for Corrective Action:*
>
> Harriet will see clints [sic] as assigned. Harriet will avoid inappropriate e-mails and other communications and will not work hours outside of those assigned.

*Timetable for Corrective Action and Possible Consequences of Failure to do so:*

Immediate corrective action is required. Failure to adhere to the above stated recommendations will result in suspension pending investigation with posible [sic] termination.

This document was not given to Plaintiff until the following day, January 28.

On January 27, Baugus and McKenzie met with Dr. Glass. They met to discuss Plaintiff's Performance Improvement Plan, their concerns regarding Plaintiff's recent behavior, and Dr. Glass' crisis intervention. Baugus and McKenzie mentioned to Dr. Glass the possibility that Plaintiff's diet medications could be affecting her behavior. It was during this meeting with Dr. Glass that McKenzie decided to require Plaintiff to undergo a fitness for duty evaluation through the EAP.

McKenzie completed and signed an EAP referral form mandatorily referring Plaintiff to the EAP. Baugus approved the referral and signed the form. As the form indicates, a representative of the Human Resources Department must approve a mandatory referral to the EAP. The form stated the reason for referral was "[b]ehavioral changes affecting [Plaintiff's] ability to work within the scope of her responsibilities."

Plaintiff met with Baugus and McKenzie on January 28, at which time they informed Plaintiff that she would be required to participate in the EAP and obtain a fitness for duty evaluation. They provided Plaintiff with the EAP referral form. McKenzie told Plaintiff she would not be allowed to resume her duties at the Health Department until she had undergone the evaluation. When Plaintiff asked why the fitness for duty evaluation was necessary, either McKenzie or Baugus told her that it was based on her erratic behavior and the possibility that her diet medi-

cations might have been adversely affecting her behavior.

During this meeting, Plaintiff strongly objected to the EAP referral and fitness for duty evaluation. She objected to "having to go through [the fitness for duty evaluation] process." She told Baugus and McKenzie that the fitness for duty evaluation was "unfair," "unlawful," and "discriminatory." She further told them: "I'm being asked to do something that doesn't make sense to me." At no time did Plaintiff complain that her rights under the ADA were being violated. At no time did Plaintiff ever use the term "disability discrimination," "ADA," or "Americans with Disabilities Act."

Plaintiff testified in her deposition that when she objected to the fitness for duty evaluation, she "didn't know anything about the Americans with Disabilities Act . . . . I just was complaining or just-not 'complaining,' but I was objecting to having to go through that process."

Although she disagreed with the need for the evaluation, Plaintiff signed the referral form on the 28th. The EAP form was then sent to St. Luke's–Shawnee Mission Health Systems, the provider of the County's EAP services. At the time Plaintiff was referred to the EAP for the fitness for duty evaluation, Sullivan did not believe Plaintiff could perform any job at the Health Department.

On January 28, McKenzie also provided Plaintiff with a Performance Improvement Plan. Under the section entitled "Statement of the Problem," the Performance Improvement Plan stated: "Obvious behavioral changes affecting her ability to work within the scope of her job responsibilities. Her actions causing concerns to other health department staff and MCH coordinator [McKenzie]."

Under the section provided for "documentation and other supporting evidence," the Performance Improvement Plan listed three items: (1) other employees were having to assume responsibility for some of Plaintiff's job duties; (2) Plaintiff had sent inappropriate information via e-mail to the Prenatal Program staff and other programs' staff members; and (3) Plaintiff's time sheets showed she had spent additional hours outside of "clinics." *Id.* (Plaintiff's "clinics" consisted of the times that she was scheduled to meet with clients of the Prenatal Program.)

The Performance Improvement Plan indicated Plaintiff was to work "within a planned time frame, considering the program needs first." In addition, she was to resume management of the Mission, Kansas office client care and charts with appropriate assistance from the staff. Outside of clinic hours she was to focus on management responsibilities.

On February 1, Plaintiff had her first EAP fitness for duty evaluation session with Dr. Glass. Dr. Glass reported that, during her three-hour session, Plaintiff had difficulty focusing her attention and responding to questions in an appropriate time frame. According to Dr. Glass' report, Plaintiff was agitated during the session. She also exhibited pressure of speech, spoke excessively, and interrupted Dr. Glass several times.

Plaintiff saw Dr. Glass again on February 3 for a short EAP session. At that time, Dr. Glass determined that an evaluation with a psychiatrist was necessary to assess various medical/psychiatric issues. Dr. Glass reported that she discussed with Plaintiff what medications Plaintiff was currently taking, as well as medications she had taken in the past.

On that same day, Plaintiff filed a written grievance with Sullivan. In the grievance, Plaintiff stated:

[I have been] [p]rohibited by Martha Hutcheson from performing in the expanded role of advanced registered nurse practitioner as defined by state statute … (Kansas Nurse Practice Act for Advanced Practice Section 60–11–107).

This prohibition constitutes an unfair working condition because my position description contains the accountability for functioning in this role. The acts & conduct of Martha Hutcheson violated my established duty & right to function in the role I was hired for & am licensed to perform.

In support of her grievance, Plaintiff provided Sullivan with a letter dated February 6, 1999. The letter explained in greater detail the reason for Plaintiff's grievance. It also set forth Plaintiff's version of what took place at the January 21 client care conference with Hutcheson and others. Plaintiff complained in her letter that Hutcheson had arbitrarily overruled her proposed plan of care for the patient. She asserted that Hutcheson, who was a Registered Nurse, did not have the authority to override a plan of care submitted by an Advanced Registered Nurse Practitioner.

Nowhere in the grievance or the February 6 letter does Plaintiff mention that she believed she had been discriminated against on the basis of age, disability, or a perceived disability or that she had been retaliated against for complaining of disability discrimination or for objecting to the fitness for duty evaluation. Sullivan began investigating the grievance and questioned several of the nurses who had participated in the January 21 client care conference.

On February 4, 1999, Dr. Glass wrote a letter to a Vellore Kirubakaran, M.D. ("Dr. Kirubakaran") referring Plaintiff for a fitness for duty evaluation. Dr. Kiruba-

karan was a psychiatrist in private practice and was not employed by the County. Dr. Glass' letter to Dr. Kirubakaran identified "[t]he specific concerns from the employer organization" as Plaintiff's "lack of focus on job responsibilities and lack of focus on supervisor's concerns at a January 26, 1999 conference." In addition, Dr. Glass' letter stated: "[P]laintiff has demonstrated considerable agitation on multiple occasions, in session and at work, and also the potentially complicating factor of possible reaction to discontinuing weight loss medication ...." Dr. Glass' letter suggested that Plaintiff's use of diet medications could have contributed to Plaintiff's work difficulties and lack of focus. The letter explained that although Plaintiff had stopped using the diet medication "fen-phen," she continued to take other medication as part of her weight maintenance program. The letter further reported that Plaintiff had exhibited "push of speech, was agitated, and spoke excessively" in two of her sessions with Dr. Glass.

Dr. Glass' letter also stated that "the following diagnoses appear to potentially need to be ruled out: Bipolar Disorder, most recent episode manic; Substance Withdrawal (from "fen-phen"); Borderline Personality Disorder." Dr. Glass asked Dr. Kirubakaran to perform a fitness for duty evaluation responding to the following concerns:

Is Ms. Conrad able to focus on job responsibilities and supervisor's concerns, and is she able to work without inappropriate agitation? If she is able to return to work, are there any treatment recommendations that will enable Ms. Conrad to remain fit for duty? If she is not able to return to work at this time, what treatment recommendations are needed so that Ms. Conrad can regain fitness for duty?

Finally, Dr. Glass requested a written report and indicated that she would contact Dr. Kirubakaran the following day to determine if Plaintiff could return to work the following Monday.

Dr. Kirubakaran conducted the fitness for duty evaluation of Plaintiff the following day, February 5. After the evaluation, he wrote a letter to Dr. Glass dated February 5. The letter was entitled "PSYCHIATRIC EVALUATION Harriet Conrad." Dr. Kirubakaran wrote that the employer's concerns included: "the patient was not able to concentrate on the job, lack of focus on job responsibilities, and lack of focus on supervisor's concerns." Dr. Kirubakaran reported that "Ms. Conrad was able to admit that perhaps, in certain situations, she may have overreacted, and not responded to her supervisor's needs. Ms. Conrad describes herself as a 'chatterbox.'"

With respect to diet medications, Dr. Kirubakaran noted: "She admits that she has been taking phenetermine for the past year. She said that in the last two months she increased to two daily from one daily .... Patient was willing to admit that the combination of phenetermine and Zoloft may be making her hyper and think fast." In addition, Dr. Kirubakaran reported that Plaintiff "admits to periods where she has problems with concentration, too much involved in planning things. She is aware that sometimes she gets to [sic] involved in her thinking and planning, then does not pay much attention to what is going on around her."

Dr. Kirubakaran also reported the following: "Ms. Conrad has no clear episodes of either hyper-manic or manic episodes, and has never been in loss of touch with reality. She is oriented to time, place, and person. Her memory is intact for both past and present. Her judgement [sic] is fair; insight fair."

Although he found "no clear symptoms at this time," Dr. Kirubakaran stated that

he had discussed with Plaintiff the need for further evaluation "to look into" an underlying "Bipolar–Affective Disorder." In addition, he had Plaintiff agree to consider coming off the phenetermine. He recommended that Plaintiff be off work for at least a week "to help her settle down." He also strongly recommended psychological testing and stated that he wanted to see Plaintiff after the testing to make a final assessment.

Plaintiff attended another EAP session with Dr. Glass on February 8. During that session, Plaintiff "disputed the need" for the fitness for duty evaluation. Plaintiff told Dr. Glass that she thought it was discriminatory for her to be given the fitness for duty evaluation when no one else at the Health Department had to undergo such an evaluation.

On that same day, a County employee, Connie Murphy ("Murphy"), contacted Dr. Glass to ask her if Hutcheson "needed to be afraid" that Plaintiff might harm her. Murphy was the Health Department's Director of Administrative Services and was in charge of operations and the clerical staff of the Health Department. Some time prior to that telephone call (probably during the time period Plaintiff was on administrative leave), Murphy had told a Health Department receptionist, Cheryl Kruger ("Kruger"), that Plaintiff had "mental problems and should be considered dangerous." Murphy also told Kruger that the police might need to be called if Plaintiff showed up at work.

On February 17, at Dr. Kirubakaran's request, Dr. Glass gave Plaintiff the MMPI–2 test. The test consisted of over 500 questions, some of which concerned sexual issues and sexual deviation, threatened assault, and situational stress due to alcoholism.

On February 22, Plaintiff was seen again by Dr. Kirubakaran for a second evaluation session. Following the evaluation, Dr. Kirubakaran reported to Dr. Glass that there was no psychiatric diagnosis. He also signed a release to return to work indicating that Plaintiff could return to work on March 1, 1999.

On February 25, Dr. Glass saw Plaintiff again and reported that Plaintiff had improved and was more focused. After Dr. Glass received Dr. Kirubakaran's report of his sessions with Plaintiff, Dr. Glass prepared a written fitness for duty evaluation. Her evaluation was provided to Baugus with a February 26 cover letter.

In her written evaluation, Dr. Glass stated: "The results of the evaluation [by Dr. Kirubakaran] indicated that Ms. Conrad does not have a psychiatric disorder and, in that regard, is fit for duty. Medical/psychiatric issues that were of concern have been resolved." Dr. Glass' evaluation further stated:

> While Ms. Conrad demonstrated some initial improvement, increased focus and decreased agitation, there are some serious reservations about Ms. Conrad being successful in her current position. Although the medical/psychiatric concerns that originally were present have cleared, Ms. Conrad's feelings and attitudes about her work leave questions about whether she is the right candidate for the job.

> Ms. Conrad demonstrates a low tolerance for working with people who may disagree with her. There appears to be a history of low-level conflict between Ms. Conrad and her supervisor's supervisor that was overlooked due to Ms. Conrad's previously satisfactory job performance.

> If Ms. Conrad is to return to work, it is recommended that there be serious discussion regarding work expectations and Ms. Conrad's role, duties and responsibilities.

Finally, Dr. Glass' evaluation noted that Dr. Kirubakaran had indicated Plaintiff would be ready to return to work on March 1.

On the same day she prepared the written evaluation, *i.e.*, February 26, Dr. Glass had a telephone conversation with Baugus. Shortly thereafter, Baugus sent an e-mail memo to McKenzie and Sullivan summarizing what Dr. Glass had told her. Baugus drafted the e-mail memo as if Dr. Glass were speaking. The memo stated in relevant part:

Looks like we are facing a situation where the medical and psychiatric conditions are resolving but the employee is dissatisfied with her job. I think the employee's problems "paranoid" are exacerbated by the these [sic] combined medical psychiatric problems that are resolving. With a fitness for duty we are covered under ADA regulations as having made reasonable accommodations.

The underlying problem is ongoing conflicts with her supervisor's supervisor, because [Plaintiff] is an ARNP and M Hutcheson [sic] is an RN. [Plaintiff] doesn't agree with management's use of her time. Complicated· by medical things that exacerbated the situation and connected with psychological issues. On top of the ongoing running conflicts. If we get the all clear from [EAP] we can discuss her return to work. The biggest issues is then job expectations, weather [sic] she agrees with her boss's boss or not. With out [sic] resolving this ongoing conflict, she will most likely be here in the same place in a few weeks.

\* \* \* \* \* \*

She has not been able to return to work until today. If she is released we need to determine how she is to perform. If she doesn't like something what are we going to do about that, discipline, discharge.

Plaintiff returned to work on March 1, 1999. At that time, Plaintiff met with McKenzie, Sullivan, Murphy, Baugus, and Dr. Glass. During the meeting, Sullivan provided Plaintiff with a memo setting forth Sullivan's expectations for Plaintiff's job performance ("Return–to–Work Plan").

The Return–to–Work Plan set forth the following expectations: "(1) [a]ll work related issues are to be discussed with and involve the direct supervisor only;" (2) feedback was to be presented in a constructive and non-judgmental, non-personal manner; (3) "[t]he relationship between supervisor and employee must be respected and that managers' directions must be followed and respected regardless of the manager's educational background"; and (4) "[i]t is not acceptable to discuss issues with peers and subordinates when those issues lead to disruptions in the work place." The Return–to–Work Plan also stated that "[a]ll duties/responsibilities of the job must be performed in a consistent and independent manner with minimal supervision." Finally, the Return–to–Work Plan warned Plaintiff that she was expected to diligently adhere to the stated expectations and that her failure to do so would result in further disciplinary action, up to and including termination of her employment.

During this meeting, Plaintiff informed the meeting participants, *i.e.*, McKenzie, Sullivan, Murphy, Baugus, and Dr. Glass, that she had reported "the incident with Ms. Hutcheson" to the following agencies: the Kansas State Board of Nursing, the Kansas Nurses Association, the Kansas Department of Health and Environment, and the United States Department of Health and Human Services. There is nothing in the record to indicate Plaintiff told the meeting participants any of the

particulars of her alleged reports; she merely told them she had reported "the incident with Ms. Hutcheson." Moreover, the record does not reveal the substance of Plaintiff's alleged reports.

In addition to meeting with Plaintiff on March 1, Sullivan gave Plaintiff a written response to the grievance that she had filed on February 3. The written response, which was signed by Sullivan and dated February 25, Sullivan denied Plaintiff's grievance. Sullivan denied the grievance based upon information she had received from some of the other employees who had participated in the January 21 client care conference. Those employees had provided Sullivan with the following information about the client care conference: Plaintiff had talked constantly throughout the conference and had wanted her patient care plan adopted even though the nine other nurses in attendance did not. Hutcheson never raised her voice with Plaintiff during the conference. No one could get in a word because Plaintiff would not quit talking. Plaintiff was highly agitated and Plaintiff acted inappropriately towards Hutcheson and the other nurses participating in the conference.

After investigating the grievance, Sullivan was concerned about Plaintiff's behavior and her belief that she could ignore her superior (Hutcheson) merely because Hutcheson had less educational experience than Plaintiff. Sullivan determined that it had been inappropriate for Plaintiff to insist that her recommended plan of care be accepted merely because she was an Advanced Registered Nurse Practitioner.

The memo McKenzie provided to Plaintiff on March 1 explained the reasons for the denial of her grievance and concluded that no evidence suggested that Hutcheson had intimidated or harassed Plaintiff and that no corrective action would be taken. The memo stated the Health Department's position that, even though Hutcheson was a Registered Nurse and not an Advanced Registered Nurse Practitioner (as was Plaintiff), Hutcheson was Plaintiff's supervisor and therefore in a position of authority over Plaintiff. The memo explained: "Even though the State of Kansas outlines and limits the scope of authority allowed by each educational level, it in no way assigns levels of authority. Levels of authority are assigned and defined solely by the employer."

After receiving Sullivan's response to her grievance, Plaintiff requested on March 1 an appeal of the denial of her grievance. On March 9, Baugus sent a memo to Plaintiff regarding her appeal. Baugus' memo stated that under the County's Grievance Policy, Policy No. 624, an employee has grievance rights only "if the employee has issues of unfair working conditions." The memo further stated that based on Sullivan's investigation, there was no evidence of any unfair employment practices. Baugus informed Plaintiff that she had therefore determined grievance rights were not available to Plaintiff.

Plaintiff was at work in the Olathe office on March 10. She did not take her scheduled lunch break and wanted to take a late lunch. She repeatedly paged McKenzie, who was at another office, to get permission to take a late lunch. Plaintiff was unable to contact McKenzie. When McKenzie returned to the Olathe office at approximately 1:20 p.m., McKenzie found that Plaintiff had yet to take her lunch break and that she had asked another staff member to cover for her and to see her scheduled patients while she went to lunch. McKenzie found Plaintiff to be agitated and exhibiting anger at the staff member who had refused to cover for her. McKenzie told Plaintiff she could take a twenty-minute lunch break, but Plaintiff refused.

McKenzie reported to Sullivan and Murphy that Plaintiff was agitated and exhibit-

ing anger towards a staff member in the clinic. After discussing these issues with McKenzie, Sullivan determined that Plaintiff should be suspended. Sullivan prepared a memo to Plaintiff notifying her that she was being suspended. The suspension notice indicated that Plaintiff had violated the written expectations she had received on March 1 by disrupting the work schedule and failing to perform her duties in a consistent manner with minimal supervision. More specifically, the notice stated that Plaintiff had violated the expectation that all work-related issues were to be discussed with her direct supervisor and not with her subordinates when such a discussion with her subordinates would lead to a disruption in the workplace. The suspension notice explained that Plaintiff had violated this expectation when she discussed taking a late lunch with a subordinate employee and when she asked the employee to cover for her. In addition, the suspension notice stated that Plaintiff had violated the expectation that her job duties were to be performed in a consistent and independent manner. It explained that Plaintiff had violated this expectation when she refused to take her scheduled lunch break and when she repeatedly paged her supervisor for permission to take a late lunch.

Finally, the suspension notice advised Plaintiff that she was being placed on a three-day paid suspension, during which time an investigation would be conducted and a final determination made as to whether she had violated her March 1 Return–to–Work Plan. A decision would then be made to either reinstate Plaintiff or terminate her employment.

Sullivan subsequently asked Wiletta Proctor ("Proctor"), a human resources consultant in the Human and Organizational Development Department, to interview employees to determine: (1) whether Plaintiff was in compliance with her Return–to–Work Plan; and (2) whether Plaintiff was creating disruptions in the workplace. Proctor interviewed six or seven Health Department staff members and summarized their comments in a report. According to her report of the employee interviews: (1) Plaintiff had a hard time concentrating on the task at hand; (2) Plaintiff spent too much with clients, time which was not proportionate to their needs and which interfered with the other clients' appointments; and (3) clients had complained about delays or had left the clinic after waiting too long. Proctor's report also indicated that the other nurse practitioners were being "pulled in to help Plaintiff about 85–90% of the time." In addition, the report indicated that direct encounters with Plaintiff were uncomfortable and that the registered nurses would not consult with Plaintiff because she tended to argue or lecture them.

Proctor concluded as follows in her report:

> It is apparent that Ms. Conrad's behavior continues to cause a disruption in the workplace, which has affected not only the staff, but most importantly the clients. This behavior has a direct effect on the productivity of the staff and the quality of patient care. Based upon this investigation, it is my recommendation to support a termination.

Sullivan was provided with a synopsis of the information contained in Proctor's report. In addition, Proctor personally recommended to Sullivan that Plaintiff be terminated. Based on that information, Sullivan concluded Plaintiff was causing significant disruptions in the work place and failing to comply with her Return–to–Work Plan. Based upon her own experience with Plaintiff, the prior disciplinary action taken against Plaintiff, the disruption caused by the scheduling issues and lunch break incident of March 10, as well

as the information obtained by Proctor from the employee interviews, Sullivan decided to terminate Plaintiff's employment. Sullivan had the authority to discipline and terminate Health Department employees.

On March 15, 1999, Sullivan provided Plaintiff with a written notice of termination. The notice stated: "A thorough investigation has been completed. It is apparent that your behavior continues to cause a disruption in the workplace, which has affected not only the staff, but most importantly, the clients. This behavior has a direct effect on the productivity of the staff and the quality of patient care." The notice stated that Plaintiff's termination of employment was effective that day. The notice advised Plaintiff of her right to a due process hearing before the Board of County Commissioners (the "Board"), and informed her of the procedures to follow if she chose to appeal the termination decision.

Plaintiff appealed the termination decision to the Board. A due process hearing was held before the Board on April 5, 1999. The Board upheld Plaintiff's termination.

Prior to Plaintiff's appeal, neither McKenzie nor Sullivan saw Dr. Glass' February 4 letter to Dr. Kirubakaran referring Plaintiff for the fitness for duty evaluation, Dr. Kirubakaran's February 5 Psychiatric Evaluation of Plaintiff, or Dr. Glass' fitness for duty evaluation.

The County has a manual containing the County's Personnel Policies and Procedures ("Personnel Manual"). Plaintiff did not receive a copy of the Personnel Manual when she was hired. Nothing in the record indicates that Plaintiff ever received or reviewed the Personnel Manual during the course of her employment with the County.

Plaintiff received an orientation binder when she was first employed by the County. Plaintiff contends that the binder does not address employment at-will. The Court's review of the binder, which was submitted by Plaintiff, shows otherwise. The binder, which is entitled "Employee Orientation Program," contains a section entitled "Employment Relationship." That section states as follows:

All employment with Johnson County shall be employment-at-will, subject to release at any time. No person shall be considered to have tenured employment with the County nor any expectation of continued or permanent employment.

Thus, contrary to what Plaintiff asserts, she did in fact receive a policy regarding employment-at-will. There is no evidence in the record, however, indicating that Plaintiff actually read this employment-at-will policy or that it was ever brought to her attention.

Plaintiff did not negotiate the language or terms of any employment policy with respect to her employment. Plaintiff did not have any discussions with McKenzie, Hutcheson, or Sullivan about the County's termination policies. Plaintiff never had any discussion with any member of the Health Department concerning whether employees could only be fired for cause. Nothing in the record indicates that any of Plaintiff's supervisors or any member of management at the County ever told Plaintiff she could be terminated only for cause or that she had any legal right to receive progressive discipline.

Some time during her employment with the County, Plaintiff attended a county-sponsored workshop on progressive discipline where the participants were told "there would be progressive discipline in terms of evaluation and ... termination." The participants were also told that managers should have reasons for any disciplinary action taken. The workshop did not address whether employees had a legal

right to progressive discipline or to be terminated only for good cause.

McKenzie testified in her deposition that she had never terminated any Health Department employee without a reason and that she was not aware of any Health Department employee who had been terminated for no reason. She also testified that she had never terminated any nurse practitioner at the Health Department who was outside of his/her probationary period. Baugus testified in her deposition that the purpose of the due process hearing is to determine if there is a good reason for taking action against the employee and that terminations by the County were "for-cause terminations." Sullivan testified in her deposition that she had never terminated anyone for no reason and that she would not have terminated Plaintiff without a good reason. Finally, Hanley, who was a Field Services Coordinator who worked under Hutcheson, testified in her deposition that pursuant to County policy, an employee must have "gone through" the discipline policy before being terminated. She also testified that the County must have a good reason to terminate an individual's employment. In Hanley's "estimation," the County's employment-at-will policy was in conflict with the County's "day-to-day" policy that good cause was needed to terminate an employee.

The County's Personnel Manual contains a policy entitled "Employment Relationship Policy" (Policy No. 124) which provides that County employees are employed at the will of the County and are subject to termination at any time with our without cause. In addition, it provides that "[n]o person shall be considered to have tenured employment with the County or any expectation of continual or permanent employment." It also provides that "[t]he procedures and guidelines established by these policies shall not constitute nor be considered as an employment contract."

The County's Disciplinary Action Policy (Policy No. 618 of the Personnel Manual) sets out various procedures for taking disciplinary action against employees. The policy provides for an "Oral Warning," a written "First Warning," and a written "Second Warning." A "First Warning" is a written warning that identifies the misconduct at issue and advises the employee about what corrective action must be taken to address the misconduct. A "Second Warning" is similar to a "First Warning" but also advises the employee that the employee may be subject to further discipline, including termination, if the misconduct is repeated.

There is no requirement that an employee receive a "First Warning" before being given a "Second Warning." The policy expressly states that if the nature of the employee misconduct is severe, the first three disciplinary steps "may be bypassed." It further states that for less serious offenses or for repetitive problems, the first three steps "may be more appropriate."

Hanley testified that she would never skip the oral warning and First Warning and go straight to the Second Warning. She testified that "in all fairness to the employee, they have a right to know that this is-consider this an oral warning followed-just mere human courtesy." She also testified: "I think it boils down to management style" and that the course of discipline taken "just depends on what the situation is... I think you have to act accordingly with what policy is in place."

McKenzie testified that, other than Plaintiff, she had never disciplined an employee without going through all the steps set forth in the Disciplinary Action Policy. Sullivan testified that she always followed the steps of Oral Warning, First Warning, and then Second Warning.

Following Plaintiff's termination, Debra Whiteman ("Whiteman") was promoted to fill the position of Prenatal Program Manager. Because the Personal Health Services Division was reorganized, the Advanced Registered Nurse Practitioner portion of Plaintiff's job duties was not filled. At the time Whiteman was promoted to Prenatal Program Manager, Whiteman was under the age of 40. Plaintiff was age 46 when she was terminated.

Plaintiff never heard McKenzie, Hutcheson, Sullivan, or Murphy make any comments that she thought indicated a bias against older employees. In January 1999, Hutcheson was 63 years of age. No one told Plaintiff that she was being terminated in whole or in part because of her age.

Hutcheson's performance appraisals dating back as far as 1982 indicate Hutcheson had trouble managing her anger and needed to work on her interpersonal relationships with her subordinates. Her performance appraisals also indicate that she engaged in confrontational behavior and finger pointing. In addition, employees found Hutcheson difficult to work for. For example, Hanley, who worked under Hutcheson, found Hutcheson to be "very intimidating" and described her as a "micromanager" whose "interpersonal skills were very much lacking." Hanley testified in her deposition that Hutcheson "had an autocratic dictatorial leadership" and engaged in "in-office bullying."

Sullivan, who was Hutcheson's superior, gave Hutcheson a written Second Warning in April of 1997. Sullivan, however, never gave Hutcheson a written First Warning,

and there is nothing in the record to indicate that any other County employee ever gave Hutcheson a written First Warning.

Sullivan testified in her deposition that Plaintiff and Hutcheson were "two separate situations." According to Sullivan, "Martha's [Hutcheson's] was an interaction type problem and nothing with her work and Harriet's [Plaintiff's] was a job-related [problem]." McKenzie testified in her deposition that although Hutcheson's conduct was similar to Plaintiff's, Plaintiff's conduct occurred "in a different setting." Plaintiff worked in a clinical setting where she served the clients. In contrast, Hutcheson did not work in the clinics and did not interact with clients. McKenzie testified that had Hutcheson's conduct occurred in the clinical setting, Hutcheson would have been "impossible to work with."

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[3] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[6]

---

3. Fed.R.Civ.P. 56(c).

4. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

5. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

6. *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact and the entitlement to judgment as a matter of law.[7] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim. The movant need only point out the nonmoving party's lack of evidence on an essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.[9] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11] To accomplish this, "the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[12]

Finally, summary judgment is not a disfavored procedural shortcut. It is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13]

### III. Analysis

#### A. Violation of the ADA by Requiring Plaintiff to Undergo a Fitness for Duty Evaluation and Psychiatric Exam

■■■ Generally speaking, the ADA prohibits employers from inquiring as to whether an employee has a disability or inquiring as to the nature and severity of any disability.[14] This prohibition is intended to prevent inquiries of employees that do not serve a legitimate business purpose.[15] An employer is allowed, however, to make medical inquiries of employees in certain situations. A regulation promulgated in accordance with the ADA provides as follows: "A covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity. A covered entity may make inquiries into the ability of an employee to perform job-related functions."[16] The Equal Employment Opportunity Commission interprets this regulation as "permitt[ing] employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job."[17] An employer's request that an employee undergo a medical examination must be supported by evidence that would "cause a reasonable person to inquire as to whether an employee is still capable of performing his[/her] job."[18] These rules apply to psychiatric and mental evaluations as well as medical examinations.[19]

---

7. *Id.* at 670–71 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

8. *Id.* at 671 (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548).

9. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

10. *Id.*

11. *Adler,* 144 F.3d at 671.

12. *Id.*

13. *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

14. 42 U.S.C. § 12112(d)(4)(A).

15. *Riechmann v. Cutler–Hammer, Inc.,* 183 F.Supp.2d 1292, 1295 (D.Kan.2001) (citing 29 C.F.R. pt. 1630, App. § 1630.13(b)).

16. 29 C.F.R. § 1630.14(c).

17. 29 C.F.R. pt. 1630, App. § 1630.13(b).

18. *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 811 (6th Cir.1999).

19. *See, e.g., id.* (applying ADA, ADA regulations, and EEOC interpretive guidance to mental exam and rejecting plaintiff's argu-

**1. Were the fitness for duty evaluation and psychiatric exam consistent with business necessity?**

█ The Court holds that requiring Plaintiff to submit to the fitness for duty evaluation and psychiatric testing was consistent with the County's business necessity. Plaintiff is an Advanced Registered Nurse Practitioner and was employed by the County as the Prenatal Program Manager in the Health Department. Plaintiff's primary job duty was to manage and deliver advanced and comprehensive prenatal nursing care for clients, and, in particular, high-risk patients. In accomplishing those tasks, she performed comprehensive physical examinations of pregnant clients and was responsible for assessing the health status of the pregnant client and her fetus.

Given the nature of Plaintiff's job duties, the County was justifiably concerned about Plaintiff's ability to perform these and other important tasks. Thus, the County sought verification of her ability to perform her job. The County had noted as early as September 1998 that Plaintiff was not focused on her job. At that time, Plaintiff's supervisor and the Maternal Child Coordinator, Ruth McKenzie, had counseled Plaintiff about not staying focused on her work and about failing to complete a sufficient amount of work on protocols that were required for state accreditation of the Prenatal Program. In November 1998, McKenzie told Plaintiff she was concerned that Plaintiff was spending too much time away from the Mission, Kansas office and that her time sheets reflected she was working too many hours. McKenzie asked Plaintiff to stay focused on her program manager responsibilities and to refrain from working after-hours late into the evening.

On January 14, 1999, McKenzie learned Plaintiff's subordinates were complaining that Plaintiff was keeping them from doing their jobs because she was spending an excessive amount of time discussing the work schedule with them. On the following day, January 15, McKenzie confronted Plaintiff about the fact that Plaintiff had spent the entire afternoon of January 13 with only one client, contributing to a chaotic clinic. McKenzie explained to Plaintiff the need to stay focused on her job. McKenzie believed Plaintiff was not spending her time on appropriate job duties.

A few days later, on the 20th, Plaintiff called McKenzie at 5:40 p.m. to express her frustration about a situation with a co-worker. McKenzie told Plaintiff she should go home and worry about the problem the next day. Plaintiff did not, however, go home and she stayed at work until approximately 12:45 a.m.

Shortly before leaving, Plaintiff sent a rambling e-mail memo to McKenzie and Martha Hutcheson, the Director of the Personal Health Services Division of the Health Department and McKenzie's superior. The memo complained about virtually every aspect of the Health Department's operations. Plaintiff sent the memo at 12:43 a.m., which was well outside of regular working hours. In the memo, Plaintiff stated that she could not "keep up this pace" and that she was "suffering from exhaustion and chronic fatigue." She also stated: "I feel like a dump, the final dumping ground."

Later that same morning, Plaintiff sent another e-mail memo to every employee at the Health Department. McKenzie properly perceived that memo as bizarre and inappropriate. The memo stated:

ment that more stringent standard should apply to mental exams); *Fritsch v. City of Chula Vista*, No. 98–0972–E–CGA, 2000 WL 1740914, at *3–6 (S.D.Cal. Feb.22, 2000) (applying ADA and ADA regulations to psychological fitness for duty evaluation).

On behalf of every wonderful, caring, dedicated servant of the people at the JCHD (includes everyone, without exception!) and as a gift to Denise Brennan and Ellen Rangel for their combined years of service. I am asking the "force" to release everyone of us from the "chains that bind" and "the walls that keep our Spirits apart".

We NEED each other to reach our shared vision, "health at the Highest Level". A vision we can attain if we are all free to do our personal best.

I believe that we have all the talent, skill, and ability we need to attain this vision! However, it remains "out of our reach" until we ALL as one "release the chains" and "tear down the walls." THE "force" THAT KEEPS U.S. APART, IS ACTUALLY LIKE THE "EMPERORS NEW CLOTHES". THERE'S REALLY NOTHING THERE! WE JUST IMAGINE THERE IS UNTIL IT BECOMES A BELIEF!

When we let go of this belief (the chains) we will be FREE at last to begin to realize our shared dream. We must each accept the reality that no matter how hard we each try in our separate ways, we can not and will not make it happen.

YET! United as ONE we are strong enough to "break down the walls".

SIMPLY, BELIEVE!!!!!!!!!!!!!!!!!!!!!!!!

As ONE, united, together, close your eyes and tell yourself, "I AM WONDERFUL! WALLS COME DOWN!!!!!!

Do it mostly for yourself, but also in recognition of these 2 "faithful" and "dedicated" ones, DENISE BRENNAN AND ELLEN RANGEL.

Some time that same morning, McKenzie met with Plaintiff and communicated her concerns about the two e-mail memos and Plaintiff's erratic behavior. During the meeting, McKenzie perceived that Plaintiff was not able to focus on the concerns she was raising.

Plaintiff continued to act inappropriately when she met with Debbie Sullivan, the Director of the Health Department, following the client care conference. During that meeting, Sullivan perceived Plaintiff to be extremely agitated, angry, and unable to control her emotions. In addition, she observed that Plaintiff's speech was very rapid and her thoughts scattered. Sullivan had never seen anyone as upset as Plaintiff was during their meeting that day. Plaintiff cried heavily and told Sullivan she was so upset that she could not think clearly. Plaintiff insisted that Hutcheson had to be stopped and that she would be the one to do it.

The following day, January 22, Plaintiff called McKenzie from home, and McKenzie perceived Plaintiff to be very upset and unfocused. McKenzie was concerned about Plaintiff's ability to do her work. Plaintiff told McKenzie that she wanted to go to the EAP because she wanted to talk to someone about what had happened at the client care conference.

Plaintiff did not work on January 22 or the following Monday, January 25. When McKenzie and Rhonda Baugus, the Employment Manager in the County's Human and Organizational Development Department, met with Plaintiff on January 26, it appeared to them that Plaintiff was unable to focus on the discussion regarding her job performance and her behavioral problems. When Plaintiff was informed that she was being placed on administrative leave, she refused to leave the premises. A psychologist from the EAP, Dr. Glass, had to be called for an on-site crisis intervention to defuse the situation.

It was only after this string of events that McKenzie and Baugus met with Dr. Glass to consult with her about a possible fitness for duty evaluation. During the meeting, McKenzie decided to require

Plaintiff to undergo a fitness for duty evaluation coordinated through the EAP.

The above-cited behavior by Plaintiff and her own unsolicited statement that she was suffering from exhaustion and chronic fatigue syndrome provided the County with a legitimate concern about Plaintiff's ability to perform her job. Plaintiff's job required that she be in full use of her mental faculties and able to focus on her clients and their medical needs and the medical needs of their unborn babies. It also required that Plaintiff be able to deal with her clients in a competent, professional, and calm manner. A public health agency such as the Defendant Health Department must be diligent in ensuring that its health care professional employees remain capable of carrying out their job duties. To fail to do so could easily jeopardize the health of the Health Department's pregnant clients and their unborn babies.

The Court does not need to decide whether it is necessary for an employer to seek advice from an outside health professional before requiring an employee to undergo a fitness for duty evaluation or other type of medical or mental exam. Here, however, Baugus and McKenzie did meet with Dr. Glass of the EAP before mandating that Plaintiff undergo the fitness for duty evaluation. Also, it was Dr. Glass, a psychologist, and not McKenzie or Baugus or any other employee of the County, who made the determination that Plaintiff should undergo the psychiatric exam by Dr. Kirubakaran.

In sum, the Court concludes that the decisions to have Plaintiff undergo the fitness for duty evaluation and psychiatric

exam were sufficiently supported by evidence that would cause a reasonable person to inquire as to whether Plaintiff was still capable of performing her job.

The Court's conclusion is consistent with other cases that have upheld mandated mental examinations of employees. For example, in *Krocka v. City of Chicago*,[20] the Seventh Circuit Court of Appeals found no ADA violation where the defendant police department required a police officer to undergo a fitness for duty evaluation upon learning that he was experiencing difficulties with his mental health. The *Krocka* court held that it was entirely reasonable—and even responsible—for the police department to require the officer to undergo a fitness for duty evaluation given that the position of police officer presents significant safety concerns, not only to other police department employees but to the public at large.[21]

Similarly, in *Sullivan v. River Valley School District*,[22] the Sixth Circuit Court of Appeals upheld a school district's request that a teacher submit to a mental and physical fitness exam after the teacher allegedly exhibited odd behavior, such as engaging in disruptive and abusive verbal outbursts, disclosing confidential information about one of his student's grades, inappropriately criticizing a decision of another faculty member, and failing to appear for a meeting with the superintendent.[23] Likewise, in *Fritsch v. City of Chula Vista*,[24] the district court upheld an employer's decision to require a staff attorney to undergo a psychological exam after she had an emotional outburst and a verbal altercation with opposing counsel during a court hearing.[25] The court noted

---

**20.** 203 F.3d 507, 515 (7th Cir.2000).

**21.** *Id.*

**22.** 197 F.3d 804 (6th Cir.1999).

**23.** *Id.* at 808, 811–812.

**24.** No. 98–0972–E–CGA, 2000 WL 1740914 (S.D.Cal. Feb.22, 2000).

**25.** *Id.*, at *1–2, 4.

that the attorney's job as a litigator required her to meet with opposing counsel and appear in court and that she should be able to perform those functions in a professional manner and be able to handle the conflict and pressures inherent in a legal dispute.[26]

In sum, the Court concludes that the record reveals sufficient justification for requiring Plaintiff to undergo the fitness for duty evaluation and psychiatric examination.

## 2. Were the fitness for duty evaluation and psychiatric exam job-related?

■ The Court must next examine whether the evaluations conducted by Dr. Glass and Dr. Kirubakaran, including the MMPI–2 test administered by Dr. Glass as part of the fitness for duty evaluation, were job-related. Plaintiff objects to the scope of the evaluations, and, in particular, asserts that the MMPI–2 test she was given exceeded the scope of any job-related exam. Plaintiff specifically complains that the MMPI–2 test questions inquiring into sexual matters, sexual deviancy, threatened assault, and stress-related alcoholism were not job-related.

The Court finds that, overall, the evaluations and testing were job-related. The focus of both Dr. Glass's and Dr. Kirubakaran's evaluations was on Plaintiff's ability to perform her job functions. To the extent Plaintiff questions the job-relatedness of the MMPI–2's questions regarding sexual matters and sexual deviancy, the Court notes that sexual deviancy and sexual behavior disorders are not considered disabilities under the ADA.[27] Consequently, questions regarding sexual matters or sexual deviancy are not covered by the ADA's prohibitions against medical or mental exams.

The Court does not agree with Plaintiff that questions relating to "threatened assault" are not job-related in this case. Given the behavior Plaintiff exhibited, it was possible that she posed a risk to her co-workers or to Hutcheson. Thus, inquiries relating to "threatened assault" were relevant in this case. In any event, the Court questions whether inquiries regarding "threatened assault"[28] would be considered a medical or mental inquiry under the ADA in the first place.

Furthermore, the Court does not agree with Plaintiff that questions relating to stress-related alcoholism are not job-related. While Plaintiff never indicated she had a drinking problem or suffered from alcoholism, a health professional conducting a comprehensive evaluation to determine whether Plaintiff was capable of performing her job would want to rule out the possibility of alcohol abuse or alcohol-related problems.

■ Even if the Court were to find that the alcoholism and "threatened assault" questions were not job-related, the Court would nevertheless decline to hold the County liable for an ADA violation. The County did not request that either Dr. Glass or Dr. Kirubakaran—neither of

---

26. *Id.*, at *4–5.

27. *See* 42 U.S.C. § 12211(a) (the term "disability" does not include homosexuality and bisexuality); 42 U.S.C. § 12111(b)(1) (the term "disability" does not included transvestitism, transsexualism, pedophilia, or other sexual behavior disorders).

28. Although Plaintiff provided the Court with a copy of the MMPI–2 test, she did not identify which of the test's 567 questions deal with "threatened assault" nor does she explain the nature of those questions. The Court should not be required to review the 567 questions to determine the substance of these questions. As a general matter, however, the Court would consider any questions regarding assault to be job-related in this case.

whom were County employees—administer the MMPI–2 to Plaintiff or that either one of them ask Plaintiff questions about assault and alcoholism. The County informed Dr. Glass of the County's specific job-related concerns and asked Dr. Glass to perform a fitness for duty evaluation of Plaintiff. It was Dr. Glass who referred Plaintiff to Dr. Kirubakaran, a psychiatrist, for a psychiatric evaluation, and it was Dr. Kirubakaran who, in turn, requested that Dr. Glass administer the MMPI–2 test to Plaintiff. Thus, the MMPI–2 questions posed to Plaintiff were given at the initiative of Dr. Glass and Dr. Kirubakaran, and not the County. Moreover, there is nothing in the record to indicate the County had any reason to know that such questions would be asked.

In short, the County relied upon outside health professionals—a psychologist and a psychiatrist—to determine the necessary scope of the fitness for duty evaluation. The County did not dictate what tests or inquiries the health professionals were to make. The County's referral form to the EAP provider demonstrates that the County was interested only in Plaintiff's job performance and whether she was able to perform the essential functions of her job. The letter from Dr. Glass to Dr. Kirubakaran, asking Dr. Kirubakaran to conduct a fitness for duty evaluation of Plaintiff, requested that Dr. Kirubakaran's evaluation address the following concerns of the County:

> Is Ms. Conrad able to focus on job responsibilities and supervisor's concerns, and is she able to work without inappropriate agitation? If she is able to return to work, are there any treatment recommendations that will enable Ms. Conrad to remain fit for duty? If she is not able to return to work at this time, what treatment recommendations are needed so that Ms. Conrad can regain fitness for duty?

■ A recent decision by Judge Murguia is instructive on this point. In *Riechmann v. Cutler–Hammer, Inc.,*[29] Judge Murguia addressed an employer's liability under the ADA in circumstances similar to this case. Judge Murguia held that a defendant employer "may not be held liable for medical inquiries made by a third party where the inquiries are *not made* at the defendants' request."[30]

In *Riechmann,* the employer asked a medical doctor to perform an independent medical exam of an employee who had suffered a severe stroke to determine whether she could still perform the essential functions of her job and whether any specific accommodations were required.[31] Without any express authorization from the employer, the physician inquired about the plaintiff's family history, drinking and tobacco usage, drug allergies, and prior illnesses, which the court found exceeded the scope of a job-related exam.[32] Judge Murguia instructed the jury that the defendant employer could not be held liable for any specific inquiries made by the examiner that the employer did not specifically request.[33] Judge Murguia denied the plaintiff's motion for judgment as a matter of law, ruling that the jury had properly found that these objectionable medical inquiries were not made at the employer's request.[34]

---

**29.** 183 F.Supp.2d 1292 (D.Kan.2001).

**30.** *Id.* at 1299–1300 (emphasis added) (citing 42 U.S.C. § 12112(d)(4); 29 C.F.R. § 1630.13(b)).

**31.** *Id.* at 1298.

**32.** *Id.* at 1299.

**33.** *Id.* at 1299–1300.

**34.** *Id.*

In this case, Plaintiff ignores the above-cited decision by Judge Murguia and instead relies on an earlier decision in that same case.[35] The earlier decision dealt with the defendant's motion for summary judgment and analyzed a different set of medical inquiries than those addressed in the decision cited above. In the summary judgment decision, the defendant employer submitted a form to the examining doctor requesting him to ask the employee what medications she was currently taking and to ask her to provide information about the dosage and frequency.[36] Judge Murguia found that those questions clearly were not job-related and were therefore improper under the ADA. In addition, he held that the employer should be held liable for requesting the examiner to pose them to the employee.[37] Judge Murguia ruled: "Where specific questions are posed to a physician, even on a form for generalized use, the employer must bear the responsibility for posing them." [38]

Relying on this rule, Plaintiff argues that the County should be liable for the MMPI–2 questions. The Court disagrees. Unlike the defendant employer in the *Riechmann* summary judgment decision, the County never asked either Dr. Glass or Dr. Kirubakaran to administer the MMPI–2 test or to pose any type of questions to Plaintiff relating to sexual matters and deviancy, alcoholism, or threatened assault. Accordingly, the County may not be held liable for the specific questions Dr. Glass asked at the request of Dr. Kirubakaran.

In light of the above, the Court holds that the County did not violate the ADA by requiring Plaintiff to undergo a fitness for duty evaluation and psychiatric examination. The Court therefore grants the County's motion for summary judgment on Plaintiff's claim that she was subjected to examinations in violation of the ADA.

**B. Discrimination in Violation of the ADA: Regarded as Disabled**

Plaintiff contends the County violated the ADA by regarding her as disabled and taking adverse employment actions against her based on the perceived disability. More specifically, Plaintiff claims the County regarded Plaintiff as having a mental impairment which substantially limited Plaintiff's ability to work. Plaintiff alleges that as a result of being regarded as disabled, she was suspended, required to participate in the EAP and undergo a fitness for duty evaluation and psychiatric examination, and subsequently terminated.

As discussed in detail below, the Court holds that Plaintiff has failed to establish a prima facie case of discrimination. This is true for two reasons. First, Plaintiff has failed to show any genuine issue of fact exists as to the essential "regarded as" element of her prima facie case. Second, Plaintiff has failed to establish any genuine issue of fact exists as to another essential element of her prima facie case, *i.e.*, that the County regarded her as having a mental impairment which *limited her ability to perform a class of jobs or a broad range of jobs in various classes.*

**1. Establishing a prima facie case of ADA discrimination**

To establish a prima facie case of discrimination under the ADA, Plaintiff must show: (1) she is disabled within the meaning of the ADA; (2) she is qualified, in that she can, with or without reasonable accommodation, perform the essential functions

---

**35.** *See Riechmann v. Cutler–Hammer, Inc.,* 95 F.Supp.2d 1171 (D.Kan.2000).

**36.** *Id.* at 1186.

**37.** *Id.*

**38.** *Id.* at 1186–87.

of the job; and (3) she was discriminated against because of her disability.[39]

When opposing a motion for summary judgment, a plaintiff need not actually "show," "prove," or "establish" anything to defeat the defendant's motion for summary judgment.[40] Instead, the plaintiff need only demonstrate the existence of a genuine issue of material fact, *i.e.*, an outcome-determinative fact, with respect to the elements of her case.[41] Nonetheless, cases decided by the Tenth Circuit on summary judgment motions directed at ADA and other employment discrimination claims often use the terms "show," "prove," and "establish."[42] Because this terminology is so often used in other decisions, this opinion will employ these terms in its discussion; however the Court will consistently impose the lesser burden on Plaintiff in deciding the motion for summary judgment.

Under the ADA, a "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[43] Here, Plaintiff relies upon subsection (C) to establish that she is disabled under the ADA. Under subsection (C), a person is "disabled" if he/she is "regarded as having" a "physical or mental impairment that substantially limits one or more of the major life activities of such individual," regardless of whether the individual actually has the impairment.[44]

### 2. The "regarded as" element of the prima facie case

■ As a threshold matter, Plaintiff must be able to establish that she was "regarded as" mentally disabled, *i.e.*, regarded as having a mental impairment that substantially limited one or more major life activities. "This 'regarded as' provision is 'intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded as having, disabilities.'"[45]

In support of her claim, Plaintiff points to numerous facts. Plaintiff first points to the fact that the County required her to participate in the EAP and undergo the fitness for duty evaluation as evidence that the County perceived her as disabled. As set forth above, the Court has determined that the EAP referral and fitness for duty evaluation were not in violation of the ADA. It is well settled that an EAP referral or a fitness for duty evaluation which complies with the ADA's requirements for physical/mental examinations is insufficient to demonstrate that an employer "regarded" the employee as disabled.[46] A request

---

**39.** *See McKenzie v. Dovala*, 242 F.3d 967, 969 (10th Cir.2001).

**40.** *Goodwin v. General Motors Corp.*, 275 F.3d 1005, 1012 n. 7 (10th Cir.2002).

**41.** *Id.*

**42.** *Id.*

**43.** 42 U.S.C. § 12102(2)(A); *see also Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 478, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

**44.** 42 U.S.C. § 12102(2)(C).

**45.** *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1327 (11th Cir.1998). *Accord Bernard*

*v. Doskocil Cos., Inc.*, 861 F.Supp. 1006, 1013 n. 13 (D.Kan.1994).

**46.** *See, e.g., Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 515 (3d Cir.2001) (request for an independent medical exam of employee to assess fitness for duty, when conducted in compliance with the ADA, is insufficient to demonstrate that employer regarded employee as disabled); *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998) (request for mental exam to determine fitness of employee who had exhibited strange behaviors did not establish that the employer "regarded" employee as disabled ); *Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000) (fitness for duty evaluations and other

for such an appropriately tailored exam only establishes that the employer harbors doubts about an employee's ability to perform a particular job, and doubts alone do not demonstrate that the employer regarded the employee as being disabled.[47] As the Eighth Circuit has stated, "employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims" alleging they unlawfully regarded an employee as disabled.[48]

Plaintiff next argues that the jury could infer the County regarded her as mentally impaired because it perceived Plaintiff as dangerous and a threat to employees. The Court finds this argument unpersuasive. Even assuming the County did perceive Plaintiff as dangerous or a threat to employees, such a perception is not indicative of whether the County regarded Plaintiff as having a mental impairment that substantially limited a major life activity.[49]

As further evidence that the County regarded her as mentally impaired, Plaintiff submits that Connie Murphy, who was the Health Department's Director of Administrative Services and who was in charge of operations and the clerical staff of the Health Department, told a Health Department receptionist, Cheryl Kruger, that Plaintiff had "mental problems and should be considered dangerous" and that the police might need to be called if she showed up at work. Even assuming this meant Murphy considered Plaintiff to be mentally impaired, there is nothing in the record to indicate that Murphy was Plaintiff's supervisor, that Murphy had any decision-making authority over Plaintiff, or that Murphy had any input into any personnel decision regarding Plaintiff. Although Murphy apparently contacted Dr. Glass on February 8 to ask her if Hutcheson "needed to be afraid" Plaintiff might harm her, this fact does not demonstrate Murphy believed she was mentally disabled. Finally, there is no evidence in the record indicating Dr. Glass ever communicated Murphy's comments to any employee of the County who had any decision-making authority or any input into any personnel decisions regarding Plaintiff. Whether Murphy may have perceived Plaintiff as mentally disabled is simply immaterial.

Plaintiff also points to the discussion about Plaintiff's use of diet medications to support her claim that the County perceived her as suffering from a mental impairment. Plaintiff asserts that either McKenzie, Hutcheson, or Sullivan suggested to her that her use of diet medications might have been causing her to act erratically. The mere fact that an employer has questions about whether medications might be causing an employee's emotional, performance, or behavioral problems does not establish that the employer regarded

---

steps taken to reassure employer that employee is fit for duty where there is legitimate concern about employee's ability to perform a particular job are not proof that employer regarded employee as disabled); *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 811 (6th Cir.1999) (request that employee undergo mental and physical exams to determine fitness for job does not establish that employer regarded employee as disabled).

**47.** *Tice,* 247 F.3d at 515.

**48.** *Cody,* 139 F.3d at 599.

**49.** *See Cody v. CIGNA Healthcare of St. Louis, Inc.,* 139 F.3d 595, 599 (8th Cir.1998) (supervisor's knowledge of odd behavior that could be associated with a mental impairment and knowledge that plaintiff had threatened to bring a gun to work did not show that employer regarded plaintiff as mentally disabled). *See also Palmer v. Circuit Court of Cook County, Ill.,* 117 F.3d 351, 352–53 (7th Cir.1997) (employee who threatened violence against coworker and supervisor was not "qualified" employee under the ADA and therefore had no viable ADA claim; ADA does not require employer to retain potentially violent employee).

the employee as disabled.[50] Even assuming arguendo that Plaintiff could establish the County considered her to be suffering from adverse effects from her diet medications, that fact does not equate to a finding that the County regarded Plaintiff as having a mental disability within the meaning of the ADA. At most, it means the County perceived Plaintiff as temporarily suffering from side effects of a medication. It does not mean the County perceived Plaintiff to be suffering from a mental impairment that substantially limited a major life activity.[51] Generally speaking, "temporary, non-chronic impairments of short duration, with little or no long-term or permanent impact" are not considered disabilities under the ADA.[52]

Finally, Plaintiff points to the February 26, 2002 e-mail memo from Baugus to McKenzie and Sullivan as evidence that the County regarded her as mentally disabled. That e-mail memo contained Baugus' notes of what Dr. Glass had reported to her about Plaintiff. The memo, written as if Dr. Glass were speaking, stated in pertinent part:

> Looks like we are facing a situation where the medical and psychiatric conditions are resolving but the employee is dissatisfied with her job. I think the employee's problems "paranoid" are exacerbated by the these [sic] combined medical and psychiatric problems that are resolving.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The underlying problem is ongoing conflicts with her supervisor's supervisor, because [Plaintiff] is an ARNP and M Hutchison [sic] is an RN. [Plaintiff]

doesn't agree with management's use of her time. Complicated by medical things that exacerbated the situation and connected with psychological issues. On top of the ongoing running conflicts. If we get the all clear from [EAP] we can discuss her return to work. The biggest issues is then job expectations, weather [sic] she agrees with her boss's boss or not. With out [sic] resolving this ongoing conflict, she will most likely be here in the same place in a few weeks.

The Court is not persuaded that this memo, which was written and sent shortly before Plaintiff was placed on administrative leave and mandatorily referred to the EAP for the fitness for duty evaluation, is evidence that Baugus considered Plaintiff to be mentally disabled. The memo is only reporting what Dr. Glass had reported to her. If anything, the memo shows Baugus understood from her conversation with Dr. Glass that Dr. Glass believed whatever mental problems Plaintiff may have had were resolving. It also shows that Baugus understood Dr. Glass regarded Plaintiff's problems to be her dissatisfaction with her job and her conflicts with Hutcheson. Thus, the Court does not agree with Plaintiff that the memo is evidence of the County regarding her as mentally disabled.

In sum, the Court finds Plaintiff has failed to establish the essential element of her prima facie case that she was disabled as a result of the County regarding her as having a mental impairment.

---

**50.** *See Steele v. Thiokol Corp.,* 241 F.3d 1248, 1256 (10th Cir.2001) (fact that supervisors evinced concerns about employee's mood swings and asked company nurse if mood swings could be side effect of plaintiff's medication "falls far short of raising a triable issue" as to whether employer regarded plaintiff as disabled).

**51.** *See* 42 U.S.C. § 12112(a) (defining the term "disability" under ADA).

**52.** *Aldrich v. Boeing Co.,* 146 F.3d 1265, 1270 (10th Cir.1998) (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j)).

### 3. The "class of jobs" element of the prima facie case

Even if Plaintiff were able to establish that the County regarded her as having a mental impairment, she has failed to set forth evidence to establish the County regarded her as having an impairment that substantially limited her *in the major life activity of working*, as she claims. In order to establish a disability under the "regarded as" prong of the ADA with respect to the major life activity of working, Plaintiff must establish the County regarded her as having an impairment that substantially limited her ability to perform a class of jobs or a broad range of jobs in various classes, as compared to the average person having comparable training, skills and abilities.[53] This occurs when the employer regards the employee's perceived impairment as "foreclosing generally the type of employment involved." [54]

A "class of jobs" is defined as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." [55] A "broad range of jobs in various classes" is defined as "[t]he job from which the individual has

been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." [56] It is well established that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." [57]

Thus, in order for Plaintiff to establish a disability under the "regarded as" prong of the ADA with respect to the major life activity of working, Plaintiff must show the County regarded her as being substantially limited in performing either a class of jobs or a broad range of jobs in various classes.

In determining whether Plaintiff was regarded as substantially limited in her ability to perform either a class of jobs or a broad range of jobs, the Court must consider:

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which

---

**53.** 29 C.F.R. § 1630.2(j)(3)(i); *Nielsen v. Moroni Feed Co.,* 162 F.3d 604, 612 (10th Cir. 1998).

**54.** *Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 904 (10th Cir.1997), *aff'd,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

**55.** 29 C.F.R. § 1630.2(j)(3)(ii)(B). *See also Sutton,* 130 F.3d at 904 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(B)); *Siemon v. AT&T Corp.,* 117 F.3d 1173, 1176 (10th Cir.1997) (quoting same); *MacDonald v. Delta Air Lines,* 94 F.3d 1437, 1444–45 (10th Cir.1996) (quoting same).

**56.** 29 C.F.R. § 1630.2(j)(ii)(C). *See also Sutton,* 130 F.3d at 904 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(C)); *Siemon v. AT&T Corp.,*

117 F.3d 1173, 1176 (10th Cir.1997) (quoting same); *MacDonald,* 94 F.3d at 1444–45 (quoting same).

**57.** 29 C.F.R. § 1630.2(j)(3)(i). *See also Sutton,* 130 F.3d at 904 (quoting 29 C.F.R. § 1630.2(j)(3)(i)); *Siemon,* 117 F.3d at 1176 (quoting same); *MacDonald,* 94 F.3d at 1445 ("If neither of these definitions is met, and an individual instead shows only that he is unable 'to perform a single, particular job,' ... the regulations and case law make clear that he has not shown that he is 'substantial[ly] limit[ed]' in the major life activity of working.' ").

the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).[58]

Nowhere in the Pretrial Order or in Plaintiff's briefs opposing summary judgment does Plaintiff identify the "class of jobs" or "broad range of jobs" from which the County allegedly disqualified her. The Court therefore could consider Plaintiff to be asserting that the County disqualified her from working only in her position of Prenatal Program Manager. As noted above, it is well established that the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.[59]

The Court will not construe Plaintiff's theory so narrowly. Plaintiff points to Sullivan's testimony that, at the time Plaintiff was referred to the EAP for the fitness for duty evaluation, Sullivan did not believe Plaintiff could perform "any job at the Health Department." In the absence of any other discussion regarding this issue, and giving Plaintiff benefit of the doubt, the Court will assume the "class of jobs" from which the County allegedly disqualified her was "any job at the Health Department."

The Court finds this description too narrow to constitute "class of jobs." As noted above, a "class of jobs" consists of jobs that utilize "similar training, knowledge, skills or abilities."[60]

Plaintiff does not explain what types of jobs were available at the Health Department. Nor does she provide any evidence relating to "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within th[e] geographical area, from which [Plaintiff] is also disqualified because of the impairment."[61] Moreover, there is no evidence of Plaintiff's level of training, skills, and abilities that would allow the Court to compare Plaintiff to the average person. Further, Plaintiff has not set forth any evidence regarding the "geographical area to which the individual has reasonable access" or the number and type of jobs demanding similar training from which Plaintiff would also be disqualified.[62] For these reasons, the Court holds Plaintiff has not set forth evidence sufficient to establish that the County regarded her as substantially limited from performing a class of jobs or a broad range of jobs in various classes, as required for her prima facie ADA case.[63]

---

**58.** 29 C.F.R. § 1630.2(j)(3)(ii). *See also Henry v. Modine Mfg.,* No. Civ. A. 97–4125–CM, 2001 WL 487943, at *9 (D.Kan. Mar.28, 2001) (quoting 29 C.F.R. § 1630.2(j)(3)(ii)).

**59.** *See Sutton,* 130 F.3d at 904 (quoting 29 C.F.R. § 1630.2(j)(3)(i)); *Siemon,* 117 F.3d at 1176 (quoting same); *MacDonald,* 94 F.3d at 1445 ("If neither of these definitions is met, and an individual instead shows only that he is unable 'to perform a single, particular job,' the regulations and case law make clear that he has not shown that he is 'substantial[ly] limit[ed] in the major life activity of working.' ").

**60.** 29 C.F.R. § 1630.2(j)(3)(ii)(B).

**61.** *Id.*

**62.** *Id*

**63.** *See Henry,* 2001 WL 487943, at *9 (plaintiff who alleged she was disqualified from performing a "class of positions" consisting of twelve jobs at defendant's manufacturing plant did not show she was disqualified from a "class of jobs" within meaning of ADA where plaintiff failed to provide evidence of (1) number and types of jobs using similar training, knowledge and skills, (2) her skills

Plaintiff cites *McKenzie v. Dovala,*[64] in support of her argument that the County regarded her as limited in the life activity of working. She does not, however, explain how that case is applicable here, and the Court does not find it applicable. In *McKenzie,* the plaintiff deputy sheriff asserted that the defendant regarded her as limited in her ability to work in the specific class of jobs comprising "law enforcement."[65] In denying the defendant's motion for summary judgment, the court held that a factual dispute existed as to whether the defendant perceived the plaintiff to be so limited. The court's decision was based on the following evidence. The plaintiff's supervisor had sought to have the plaintiff decertified as a "peace officer" as defined by state law because the supervisor "didn't feel that she should be a law enforcement officer any longer."[66] By seeking to decertify the plaintiff, the defendant effectively sought to bar the plaintiff from working not only in her sheriff's deputy job but also in any job as a campus police officer, an investigator for hunting and fishing outfitters, a livestock inspector, a park superintendent, or a park ranger.[67] Furthermore, the defendant had rejected the plaintiff's request to reapply for employment on the basis that management thought "she would be better off in some other field."[68]

In sum, the plaintiff in *McKenzie* identified a specific class of jobs (law enforcement) and presented specific evidence showing the defendant considered her unable to perform a variety of law enforcement positions, not just in the defendant sheriff's department but in other positions with other employers in the state. Plain-

tiff has not done this in the case at bar. Plaintiff has not identified a particular class of jobs, but only a vague group of unspecified of jobs, *i.e.,* those that existed in the Health Department. Moreover, Plaintiff has not presented any evidence that the County considered her unable to perform a variety of other types of jobs with the County or with any other employers. Nor has she presented evidence that the County believed she would be "better off" in a field other than nursing. For these reasons, the Court does not find *McKenzie* controlling.

In light of the above, the Court holds Plaintiff has failed to establish that the County regarded her as substantially limited from performing a class of jobs or a broad range of jobs in various classes, as required for her prima facie ADA case. Because Plaintiff has failed to establish a prima facie case of ADA discrimination under the "regarded as" provision, the County is entitled to summary judgment on this claim.

## C. Retaliation in Violation of the ADA

### 1. Plaintiff's contentions

Plaintiff contends she engaged in protected activity under the ADA on several occasions and that the County retaliated against her for doing so when they (1) suspended her on two different occasions, (2) gave her a "Second Warning," (3) mandated her to the EAP and required her to undergo the fitness for duty evaluation, and (4) terminated her employment. Plaintiff claims she engaged in protected activity under the ADA when she com-

and abilities in order to compare them to average person, and (3) the geographical area to which she had reasonable access, and (4) the number and type of jobs demanding similar training).

**64.** 242 F.3d 967 (10th Cir.2001).

**65.** *Id.* at 971–72.

**66.** *Id.* at 972.

**67.** *Id.*

**68.** *Id.*

plained about the mandatory EAP referral and about being required to undergo the fitness for duty evaluation.

### 2. Proof scheme

The ADA provides that it is "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by [the ADA]." [69] It also provides that it is unlawful "to discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA]." [70]

■■■ Under the ADA, an employee must prove the following elements in order to establish a prima facie case of retaliation: (1) the employee engaged in an activity protected by the statute, such as protected opposition; (2) the employee was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity or opposition; and (3) a causal connection existed between the protected activity or opposition and the adverse action. [71]

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. [72] If the employer satisfies this burden of production, then, in order to prevail on her retaliation claim, plaintiff must show that the employer's articulated reasons for the adverse action are pretextual, *i.e.,* unworthy of belief. [73]

### 3. Establishing her prima facie case and the element of protected opposition

■■■ To satisfy the first element of her prima facie case, *i.e.,* that she engaged in protected opposition, Plaintiff need not show that she suffers from an actual disability or that her employer regarded her as having a disability. [74] By its express terms, the ADA retaliation provision protects "any individual" who has opposed any act or practice made unlawful by the ADA. [75] Thus, it is sufficient that the employee have a good faith, objectively reasonable belief that her activity is protected by the ADA. [76] Moreover, a plaintiff does not have to show that the conduct she opposed was actually a violation of the ADA or show that her complaint was valid; opposition activity is protected as long as the employee can establish that her complaint was based on a mistaken good faith belief that discrimination or other violation of the ADA occurred. [77]

■■■ The Court will now examine what evidence Plaintiff has submitted in support of her claim that she engaged in protected opposition. The record reveals that during the January 26, 1999 meeting with McKenzie and Baugus, Plaintiff strongly objected to McKenzie's conclusion that she was exhibiting erratic behaviors that were affecting her ability to do her job. In addition, Plaintiff told McKenzie and Baugus that it was discriminatory for them to

---

69. 42 U.S.C. § 12203(b).

70. 42 U.S.C. § 12203(a).

71. *Selenke v. Med. Imaging of Colo.,* 248 F.3d 1249, 1264 (10th Cir.2001) (internal quotations and citations omitted).

72. *Id.*

73. *Id.*

74. *Id.*

75. *Id.* (citing 42 U.S.C. § 12203(a)).

76. *Id.* (citations and quotations omitted).

77. *Pastran v. K–Mart Corp.,* 210 F.3d 1201, 1205 n. 4 (10th Cir.2000) (internal quotations and citations omitted) (applying rule to Title VII case); *see also Love v. RE/MAX of America, Inc.,* 738 F.2d 383, 385 (10th Cir.1984) (concluding that "opposition activity is protected when it is based on a mistaken good faith belief that Title VII has been violated.").

accuse her of erratic behavior and to ignore that same type of behavior in others, particularly the behavior of Hutcheson.

Two days later, when Plaintiff met with Baugus and McKenzie on the 28th, Plaintiff complained to them about the mandatory EAP referral and fitness for duty evaluation. Plaintiff objected to "having to go through [the fitness for duty evaluation] process." She told them the fitness for duty evaluation was "unfair," "unlawful," and "discriminatory." She further told them: "I'm being asked to do something that doesn't make sense to me." At no time, however, did Plaintiff ever complain that her rights under the ADA were being violated nor did she ever use the term "disability discrimination," "ADA," or "Americans with Disabilities Act." In fact, Plaintiff admitted in her deposition that when she objected to the fitness for duty evaluation, she "didn't know anything about the Americans with Disabilities Act .... I just was complaining or just-not 'complaining,' but I was objecting to having to go through that process."

The only other evidence presented of alleged protected opposition consists of statements that Plaintiff made to Dr. Glass during her February 8, 1999 EAP session. During that session, Plaintiff "disputed the need" for the fitness for duty evaluation and told Dr. Glass that it was discriminatory for her to be given the fitness for duty evaluation when no one else at the Health Department had to undergo such an evaluation.

The Court is not persuaded that these facts support Plaintiff's claim that she engaged in protected opposition. They do not demonstrate Plaintiff held an objectively reasonable belief that her opposition to the fitness for duty evaluation was protected by the ADA. Nor do they show

Plaintiff had a good faith belief that discrimination or some type of violation of the ADA had occurred or was about to occur. At most, Plaintiff's complaints were generic complaints of unfairness and unlawfulness that were not tied to the ADA, either in terms of disability discrimination or a violation of the ADA. Indeed, by her own admission, Plaintiff did not know anything about the ADA at the time she objected to the evaluation. She merely was complaining in a generic sense that the evaluation was unfair and that it was unfair for the County to accuse of her erratic behavior, when they allegedly ignored similar erratic behavior on Hutcheson's part.

There is nothing else in the record to indicate Plaintiff complained about the EAP referral or fitness for duty evaluation. Nor is there any evidence to indicate Plaintiff ever complained about any other alleged violations of the ADA. Although Plaintiff's affidavit refers to retaliation for objecting to the County's mistaken perception that she had a mental disability, those references are nothing more than conclusory allegations. For example, Plaintiff's affidavit states that she "contends that she was retaliated against for objecting to the County's mistaken perception that she had a mental disability." Her affidavit also states it is her "sincere belief" that the discipline and termination had nothing to do with her job performance and "instead had everything to do with ... [her] objection to being regarded by the Health Department and County as having a disability." Contentions and beliefs are not evidence and cannot be used to create issues of fact where none exists.[78]

In light of the above, the Court concludes Plaintiff has failed to set forth sufficient evidence from which a reasonable

---

**78.** *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1408 n. 7 (10th Cir.1997) ("[S]ubjective belief of discrimination is not sufficient to preclude summary judgment.").

factfinder could conclude she engaged in protected activity under the ADA. Plaintiff's failure to establish this essential element of her prima facie case is fatal to her ADA retaliation claim, and summary judgment will be granted in favor of the County on this claim.

**4. The County's legitimate, nonretaliatory reasons for its actions and Plaintiff's failure to establish pretext**

Even if the Court were to hold that Plaintiff had presented sufficient evidence regarding protected opposition, her ADA retaliation claim would still fail because she has failed to raise any inference of pretext. As set forth below, the County has offered legitimate, nonretaliatory reasons for the adverse employment actions it took against Plaintiff, and Plaintiff has failed to provide evidence sufficient to create an inference of pretext.

*a. The County's legitimate, nonretaliatory reasons for its actions*

Plaintiff contends the adverse actions taken against her consisted of: (1) suspending her for one and one-half days on January 26; (2) giving her a "Second Warning" on January 26; (3) suspending her again on March 10 for three days; and (4) terminating her employment on March 15.

■■■ The Court finds the County has articulated legitimate, nonretaliatory reasons for suspending Plaintiff for one and one-half days on January 26 and for giving her the Second Warning. As is discussed in more detail in Part III.A.1. above, Plaintiff sent two inappropriate e-mail memos, one of which stated that she was suffering from exhaustion and chronic fatigue and that she should could not "keep up the pace" at work. Plaintiff continued to work outside of regular hours even though she had been counseled not to do so. She had

been counseled about failing to see clients as scheduled.

■■■ The County has also articulated legitimate, nonretaliatory reasons for suspending Plaintiff a second time, on March 10. Plaintiff was suspended after she refused to take her lunch break at the scheduled time and after she created a disruption in the office by trying to get a subordinate employee to cover for her. When McKenzie met with Plaintiff immediately following the lunch break incident, McKenzie observed Plaintiff to be agitated and exhibiting anger at the staff member who had refused to cover for her.

As stated in the March 10 suspension notice that Sullivan gave Plaintiff, Sullivan determined Plaintiff had violated the written expectations she had received on March 1 by disrupting the work schedule and failing to perform her duties in a consistent manner with minimal supervision. More specifically, the suspension notice stated Plaintiff had violated the expectation that all work-related issues be discussed with Plaintiff's direct supervisor and not with her subordinates when such a discussion with the subordinates would lead to a disruption in the work place. The suspension notice indicated Plaintiff had violated this expectation by discussing taking a late lunch with a subordinate employee and asking the employee cover for her. The suspension notice also stated that Plaintiff had violated the expectation that her job duties were to be performed in a consistent and independent manner. This expectation was violated when Plaintiff refused to take her scheduled lunch break and when Plaintiff repeatedly paged her supervisor regarding her desire to take a late lunch. The Court finds these stated reasons to be nonretaliatory and legitimate reasons for Plaintiff's suspension.

■■■ The County has also articulated legitimate, nonretaliatory reasons for ter-

minating Plaintiff's employment. After suspending Plaintiff on March 10, Sullivan asked Wiletta Proctor, a consultant with the County's Human and Organizational Development Department, to interview other employees and determine if Plaintiff was still creating disruptions in the workplace. Proctor interviewed six or seven employees and they reported the following: (1) Plaintiff had a hard time concentrating on the task at hand; (2) Plaintiff spent too much with clients, time which was not proportionate to the clients' needs and which interfered with the other clients' appointments; and (3) clients had complained about delays or had left the clinic after waiting too long. Those employees interviewed stated that the other nurse practitioners were being pulled in to help Plaintiff approximately 85–90% of the time. In addition, the interviewees reported that direct encounters with Plaintiff were uncomfortable and that the registered nurses would not consult with Plaintiff because she tended to argue or lecture them.

Based on these interviews, Proctor concluded in her report that Plaintiff had continued to cause a disruption in the workplace, which had affected not only the staff but also the clients. She also concluded that Plaintiff's behavior had a direct effect on the productivity of the staff and the quality of patient care. Proctor recommended in her report that Plaintiff be terminated.

Sullivan was provided a synopsis of the information contained in Proctor's report, and based on that information, she concluded Plaintiff was causing significant disruptions in the work place and was failing to comply with her Return-to-Work Plan. Proctor also personally told Sullivan that she recommended Plaintiff be terminated. Sullivan provided Plaintiff with a written notice of termination which informed Plaintiff that an investigation had been completed and that it had been determined Plaintiff's behavior was continuing to cause a disruption in the workplace, affecting the clients as well as the staff. The termination notice also explained that Plaintiff's behavior had a direct effect on the productivity of the staff and the quality of patient care. Certainly, all of these stated reasons were legitimate and nonretaliatory reasons for terminating Plaintiff's employment as Prenatal Program Manager.

### b. Plaintiff's failure to establish pretext

Given that the County has articulated legitimate, nonretaliatory reasons for its employment actions, Plaintiff must now show those reasons are pretextual, *i.e.*, unworthy of belief.[79]

To establish pretext in a retaliation claim, a plaintiff must show "that the tendered reason for the employment decision was not the genuine motivating reason, but rather was a disingenuous or sham reason." [80] The plaintiff may accomplish this by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted ... reasons." [81] Such allegations, however, "must contain more than a skeptical claim,

79. *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir.2001).

80. *English v. Colo. Dep't of Corrections*, 248 F.3d 1002, 1010 (10th Cir.2001) (internal quotations and citations omitted).

81. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (internal quotations and citations omitted).

as conjecture alone is insufficient to withstand summary judgment."[82]

▮ To determine whether a plaintiff has shown that the defendant's stated reasons are pretextual, the court must examine the facts as they appeared to the decisionmaker; the court may not replace the employer's business judgment with the court's own analysis.[83] The court's role is to prevent unlawful employment practices, not to act as a "super personnel department that second guesses employers' business judgments."[84]

▮ Moreover, the defendant need not persuade the court that the reasons it offers to justify the plaintiff's termination were wise or correct; the court's inquiry is limited to whether the defendant honestly believed those reasons.[85] Also, it is the employer's perception of the employee's performance that is relevant, not the plaintiff's subjective evaluation of his/her own relative performance.[86]

In support of her argument that the County's articulated reasons are pretextual, Plaintiff advances four theories. First, Plaintiff asserts Hutcheson engaged in "the same behavior" as Plaintiff for twenty years, but she was never mandated to the EAP to undergo a psychiatric evaluation like Plaintiff and she was never terminated.

▮ One way a plaintiff may establish pretext is to provide evidence that she

was treated differently "from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness."[87] In determining whether employees are similarly situated, a court should "compare the relevant employment circumstances, such as work history and company policies applicable to the plaintiff and the intended comparable employees."[88] Trivial or accidental differences in treatment, or those explained by a nondiscriminatory or nonretaliatory motive, do not show that the employer's reasons for the adverse employment action are pretextual.[89] The plaintiff bears the burden of establishing that she and the comparable employees are in fact similarly situated.[90]

▮ In support of her theory that Hutcheson is similarly situated to Plaintiff, Plaintiff claims Sullivan, Baugus, and McKenzie, in their depositions, accused Plaintiff of engaging in the same behavior as Hutcheson. The Court does not find this claim to be supported by the record. Sullivan distinguished between Plaintiff and Hutcheson, testifying that Plaintiff and Hutcheson were "two separate situations." According to Sullivan, Hutcheson had "an interaction type problem" that had "nothing [to do] with her work." In contrast, Plaintiff's problem was, according to Sullivan, "job-related." McKenzie also distinguished between Hutcheson's and Plaintiff's situations. Although McKenzie testi-

---

**82.** *Powers v. Tweco Prods., Inc.,* 206 F.Supp.2d 1097, 1117 (D.Kan.2002) (citing *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999)).

**83.** *Id.*

**84.** *Simms v. Okla. ex rel. Dep't of Mental Health,* 165 F.3d 1321, 1330 (10th Cir.1999) (internal quotations and citations omitted).

**85.** *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1318 (10th Cir.1999).

**86.** *Furr v. Seagate Tech., Inc.,* 82 F.3d 980, 988 (10th Cir.1996).

**87.** *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1230 (10th Cir.2000); *accord Aramburu v. Boeing Co.,* 112 F.3d 1398, 1408 n. 7 (10th Cir.1997).

**88.** *Kendrick,* 220 F.3d at 1232.

**89.** *Id.*

**90.** *Kelley v. Goodyear Tire & Rubber Co.,* 220 F.3d 1174, 1178 (10th Cir.2000).

fied that Hutcheson's conduct was similar to Plaintiff's, she testified that Plaintiff's conduct occurred "in a different setting." Plaintiff worked in a clinical setting where she served the clients. Hutcheson, on the other hand, did not work in the clinics and did not interact with clients. McKenzie testified that had Hutcheson's conduct occurred in the clinical setting, Hutcheson would have been "impossible to work with." Contrary to what Plaintiff asserts, this testimony of McKenzie and Sullivan supports the proposition that Plaintiff and Hutcheson were not similarly situated. Also, contrary to what Plaintiff asserts, there is no testimony by Baugus in the record accusing Plaintiff of engaging in the same behavior as Hutcheson.

The Court's own review of the record reveals that Plaintiff and Hutcheson did not engage in the same type of behavior. Hutcheson's performance appraisals indicate that Hutcheson had trouble managing her anger and that she needed to work on her interpersonal relationships with her subordinates. The appraisals also showed that Hutcheson engaged in confrontational behavior and finger pointing. In addition, Victoria Hanley, a Field Service Coordinator who worked under Hutcheson, testified that Hutcheson was "very intimidating" and a "micromanager," whose "interpersonal skills were very much lacking." Hanley also testified that Hutcheson "had an autocratic dictatorial leadership" and engaged in "in-office bullying."

This evidence demonstrates that Hutcheson had poor interpersonal and managerial skills and was intimidating and confrontational in dealing with her co-workers and subordinates. While certainly not desirable, this behavior was not similar to Plaintiff's and did not occur in the clinic setting where it would directly affect clients of the Health Department. Unlike Hutcheson, Plaintiff was accused of sending inappropriate e-mails memos, engaging in erratic behavior, and not being able to focus on her job duties, which predominately involved clinic duties. The potential for Plaintiff's behavior to adversely affect clients was much higher than Hutcheson's. The Court therefore concludes that Plaintiff has failed to meet her burden to show that she and Hutcheson were similarly-situated employees who had engaged in misconduct of "comparable seriousness."

Plaintiff's second theory in support of her argument that the County's articulated reasons are pretextual is that the County failed to follow its Disciplinary Action Policy. Specifically, Plaintiff alleges that the County failed to give Plaintiff an Oral Warning followed by a First Warning before it gave her the Second Warning, a sequence set out in the Disciplinary Action Policy.

▉▉▉▉ A plaintiff may, in certain circumstances, establish pretext by showing that the defendant acted contrary to a written policy prescribing the action to be taken by the defendant under the circumstances.[91] The mere fact that an employer failed to follow its own policy or internal procedures, however, does not always establish that the employer was motivated by illegal discriminatory or retaliatory intent or that the substantive reasons given by the employer for its employment decision were pretextual.[92]

The Tenth Circuit has made it clear that not every difference in treatment will establish a discriminatory or retaliatory intent. In *Kendrick v. Penske Transportation Services, Inc.,*[93] the Tenth Circuit

---

**91.** *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1230 (10th Cir.2000).

**92.** *Randle v. City of Aurora,* 69 F.3d 441, 454 (10th Cir.1995) (citing *Ingels v. Thiokol Corp.,* 42 F.3d 616, 623 (10th Cir.1994)).

**93.** 220 F.3d 1220, 1232 (10th Cir.2000).

recognized that the anti-discrimination and anti-retaliation laws "do[ ] not make unexplained differences in treatment per se illegal nor [do they] make inconsistent or irrational employment practices illegal." [94] As the Tenth Circuit stated:

> Human relationships are inherently complex. Large employers must deal with a multitude of employment decisions, involving different employees, different supervisors, different time periods, and an incredible array of facts that will inevitably differ even among seemingly similar situations .... What the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class characteristics [or retaliate against them for engaging in protected opposition].[95]

To the extent there is any inconsistency in following the employer's internal procedures, it generally "goes to process and not to purpose or motivation" and does not always provide a sufficient basis for finding pretext.[96] This is particularly true where the defendant is not relying on its procedures or policies to support its adverse employment action.[97]

In this case, the County is not relying on its Disciplinary Action Policy to support its decisions to require Plaintiff to undergo the fitness for duty evaluation, to suspend Plaintiff on two occasions, or to terminate Plaintiff's employment. Thus, the County's alleged failure to give plaintiff an Oral Warning followed by a First Warning before giving Plaintiff a Second Warning is not evidence of pretext.

Even if the Court were to find that the County was relying on its Disciplinary Ac-

tion Policy to some extent to support all of the above-mentioned adverse employment actions, the Court does not find the County's claimed failure to give Plaintiff an Oral Warning and First Warning was actually a violation of the Policy. The Policy uses sufficient discretionary language to allow the County to by-pass certain warnings. Paragraph A.2 of the Policy expressly states that if the nature of the employee misconduct is severe, the first three disciplinary steps "may be by-passed." It further states that for less serious offenses or for repetitive problems, the first three steps "may be more appropriate." Here, management determined that Plaintiff's misconduct was severe enough to warrant a Second Warning. Thus, the County's alleged failure to give Plaintiff an Oral Warning and First Warning is not evidence of pretext.

This is particularly true here, where the employee against whom Plaintiff is attempting to compare herself Martha Hutcheson—apparently received a Second Warning without having received a First Warning. This cuts against any inference that retaliation motivated the adverse employment actions taken against Plaintiff.

The Court also notes that the County had begun counseling Plaintiff about performance and work-related issues in the fall of 1998. In September 1998, McKenzie counseled Plaintiff about not completing sufficient work on protocols for the Prenatal Program that were required for state accreditation. Then, in mid-November, McKenzie had a conference with Plaintiff during which McKenzie discussed her concerns about Plaintiff's job performance. McKenzie instructed Plaintiff to

---

**94.** *Id.*

**95.** *Id.* (quoting *EEOC v. Flasher Co.,* 986 F.2d 1312, 1319 (10th Cir.1992)).

**96.** *Randle,* 69 F.3d at 454 (quoting *Ingels,* 42 F.3d at 623).

**97.** *Id.* at 454–55 (refusing to find that employer's failure to follow its own promotion procedures was pretextual when defendant "[was] not offering its procedures as a reason for its ultimate decision" to promote a white employee over the minority plaintiff).

refrain from working after-hours late into the evening, and she asked Plaintiff to stay focused on her program manager responsibilities. On January 15, 1999, McKenzie counseled Plaintiff again, this time about Plaintiff having spent the entire afternoon with only one client, which had contributed to a chaotic clinic. McKenzie once again instructed Plaintiff to stay focused on her job. While none of these counseling sessions resulted in a First Warning as specifically described in the Disciplinary Action Policy, these sessions show that the County had begun observing, and counseling Plaintiff about, her performance well before she engaged in the alleged protected opposition. This negates any inference that the County retaliated against Plaintiff because of her claimed protected opposition.[98]

■ The third theory propounded by Plaintiff to show pretext is that Plaintiff's job performance was "exemplary" during the time that she was being disciplined. It is true that a plaintiff may, in some circumstances, show pretext by showing that the defendant employer had praised the employee's job performance in close temporal proximity to the alleged adverse employment action.[99]

■ Here, Plaintiff claims to have presented "strong evidence" that her performance was "exemplary" and meeting or exceeding the County' expectations during the time period she was being disciplined and ultimately terminated. Plaintiff's evidence on this point consists of McKenzie's thank-you note and Plaintiff's performance

evaluations. For the reasons discussed below, the Court does not find this evidence supports Plaintiff's position.

The Court will first examine the evidence regarding the thank-you note. In the note, McKenzie thanked Plaintiff for the Christmas gift she had given her, and then stated: "Its great to see how the Prenatal Program has grown in numbers this year. Know it has been very challenging for you with staff changes, but you have done a great job." McKenzie gave the thank-you note to Plaintiff in early January 1999.

The Court does not find the note raises an inference of pretext, for several reasons. First, McKenzie's note was merely an informal thank-you note. It was not an official document from management and was not some type of performance appraisal.

Secondly, and more importantly, the praise given to Plaintiff did not address those performance issues that were used to support the decisions to require Plaintiff to undergo a fitness for duty evaluation, to suspend Plaintiff, or to terminate Plaintiff, i.e., Plaintiff's inappropriate e-mail memos, her erratic behavior, her inability to focus on her job duties, and her actions on March 10 regarding scheduling and her lunch break. For the praise to be relevant and raise an inference of pretext, the praise must relate to the same issue that the employer purportedly relied upon in taking the adverse action against the employee. For example, the Ninth Circuit has held that letters praising an employ-

---

**98.** *See Doebele v. Sprint Corp.,* 157 F.Supp.2d 1191, 1220 (D.Kan.2001) (plaintiff failed to show pretext where defendant had begun to discipline plaintiff *before* she ever engaged in protected activities); *Soileau v. Guilford of Maine, Inc.,* 928 F.Supp. 37, 54 (D.Me.1996) (holding summary judgment appropriate where plaintiff's difficulties at work predated acknowledgment that he was suffering psychological disability; prior difficulties negat-

ed inference that plaintiff's termination came as a result of his requested accommodation or his alleged disability).

**99.** *See Strother v. Southern Cal. Permanente Med. Group,* 79 F.3d 859, 870–71 (9th Cir. 1996). (determining that letters praising the plaintiff, written at about the same time as the adverse employment action was taken, created inference of pretext).

ee's interpersonal skills, when combined with temporal proximity, were sufficient reason to question an employer's assertion that it terminated the employee for poor interpersonal skills.[100] The note at issue here does not contradict the County's stated reasons for taking the adverse employment actions against Plaintiff.

Third, the timing of the note does not support an inference of pretext. The note was not sent *during* the time period when Plaintiff sent the inappropriate e-mails in January and when she was perceived as acting erratically and inappropriately, but rather *before* that conduct occurred. In other words, McKenzie was not acting in a contradictory manner by praising Plaintiff in early January and then taking employment actions against Plaintiff several weeks and even months later. For all of these reasons, the Court does not find that the McKenzie thank-you note creates an inference of pretext.

The Court will now examine Plaintiff's performance evaluations, which Plaintiff claims showed she was an exemplary employee. The parties have stipulated that "[a]ll of the written evaluations in Plaintiff's personnel file show she was meeting or exceeding Defendants' expectations." The Court does not find these evaluations probative of pretext, since the last evaluation was performed in February 1998, almost one entire year before Plaintiff engaged in her alleged protected opposition. Furthermore, McKenzie testified that Plaintiff met or exceeded the County's expectations only up until the fall of 1998.

The Court does not find any other facts in the record to support Plaintiff's claim that she was an "exemplary" employee or that Plaintiff was meeting or exceeding her employer's expectations at the time the County took its employment actions against her.

Plaintiff's fourth and final theory is that the County has given differing and inconsistent reasons for the actions it took against Plaintiff. In support of this theory, Plaintiff asserts that Sullivan testified that the lunch break incident had nothing to with Plaintiff's termination, even though that was a reason given to Plaintiff for her suspension and termination. The Court does not agree with Plaintiff's characterization of Sullivan's testimony, for two reasons. First, her testimony related to Plaintiff's suspension and not her termination. Second, Plaintiff has taken this statement out of the context of Sullivan's other deposition testimony. While Sullivan did testify that Plaintiff's suspension "didn't have anything to do with the lunch break," that testimony should not be viewed in total isolation. To understand Sullivan's full meaning, the Court will examine that comment in the context of her other testimony, which is as follows:

Q: How did you feel that Harriet had not followed direction, or a suspension was warranted?

A: Well, I think she was trying to change the work schedule without Ruth's [McKenzie's] knowledge.

Q: And you're—when you say that, you're referring to the lunch break?

A: No. It didn't have anything to do with the lunch break. It was some other schedule that was being changed, or wanted to be changed, that shouldn't have been, and she was not—she was not performing her duties, her work she had scheduled in clinic.

Sullivan's testimony about Plaintiff wanting to change the work schedule is consistent with the reasons given to Plaintiff for her suspension, and the fact that Sullivan testifies the suspension didn't re-

**100.** *Id.*

late to a change in the *lunch* schedule appears to be nothing more than a lapse of memory on Sullivan's part. Her later testimony addresses the lunch break incident in detail, and that testimony is consistent with the reasons given to Plaintiff for her suspension. This minor inconsistency is not sufficient to raise an inference of pretext.

Plaintiff also argues that an inconsistency between Sullivan's affidavit and Sullivan's testimony regarding the role Proctor's report of employee interviews played in the termination decision is evidence of pretext. Again, the Court finds this inconsistency to be insufficient to raise an inference of pretext. In her affidavit, Sullivan states Proctor "provided" her with a report of how other employees viewed Plaintiff's behavior after she returned to work, and, "after reading the report," Sullivan concluded Plaintiff was not complying with the Return–to–Work Plan and was causing disruptions in the work place. The affidavit further states that Sullivan decided to terminate Plaintiff based upon her experience with Plaintiff, the previous disciplinary action she had taken against Plaintiff, and "the report provided by Proctor." In her deposition, Sullivan testified that Proctor's summary of her employee interviews "was not part of the decision process." Sullivan went on to testify, however, that she did not see the actual summary prepared by Proctor, *i.e.*, the document itself, but that she was given a synopsis of the information contained in the document from either Proctor or Baugus, or perhaps someone else. She further testified that Proctor recommended to her, based on the results of the employee interviews, that

Plaintiff be terminated. The Court does not find these minor inconsistencies of sufficient weight to raise an inference of pretext.

In sum, the Court finds Plaintiff has failed to come forward with any evidence suggesting the adverse employment actions taken against her were pretextual. Because Plaintiff has failed to meet her burden of establishing both a prima facie case and pretext, summary judgment must be granted in favor of the County on her ADA retaliation claim.

### D. Discrimination in Violation of the ADEA

Plaintiff claims she was discharged in violation of the ADEA. In evaluating ADEA claims when no direct evidence of discrimination exists, the Tenth Circuit uses the three-stage analysis outlined in *McDonnell Douglas Corp. v. Green* to prove discrimination.[101] At the first stage, the plaintiff must prove a prima facie case of discrimination, *i.e.*, that (1) she is within the protected age group; (2) she was doing satisfactory work; (3) she was discharged; and (4) her position was filled by a younger person.[102] In the second stage, the defendant must carry the burden to provide a legitimate nondiscriminatory reason for plaintiff's termination.[103] If the defendant articulates a legitimate, nondiscriminatory reason for its action, the burden of production shifts back to the plaintiff, who must also carry the burden of persuasion.[104] In the third stage, the plaintiff must show age was a determinative factor in the defendant's employment decision or that the defendant's explanation was merely a pretext for age discrimination.[105]

101. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir.1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

102. *Id.* (citations omitted).

103. *Id.* (citations omitted).

104. *Id.* (citations omitted).

105. *Id.* (citations omitted).

■ The County asserts Plaintiff cannot establish a prima facie case for three reasons. First, the County asserts that Plaintiff fails to submit evidence of Debra Whiteman's age (who Plaintiff claims replaced her), and, thus, Plaintiff cannot establish that Whiteman was younger than Plaintiff. The County fails to recognize, however, that the parties stipulated in the Pretrial Order that "Plaintiff's replacement is under the age of 40." In addition, it is undisputed that Plaintiff was 46 years of age at the time she was terminated. Thus, Plaintiff has established this prong of her prima facie case.

■ Second, the County asserts Plaintiff cannot show she was actually "replaced" by Whiteman. Following Plaintiff's termination, Whiteman was promoted only to direct the Prenatal Program, and, because the Personal Health Services Division was reorganized, the Advanced Registered Nurse Practitioner portion of Plaintiff's position was never filled. The Court notes, however, that the County declares in its statement of uncontroverted facts that "Debra Whiteman ('Whiteman') replaced the Plaintiff after the Plaintiff was terminated from employment." The County may not attempt to controvert its very own statement of fact. In addition, as noted above, the parties stipulated in the Pretrial Order that "Plaintiff's replacement" was under the age of 40, indicating that Plaintiff was in fact "replaced." Moreover, it is sufficient for purposes of the "replacement" prong of the prima facie case that some of the plaintiff's job duties were taken over by the younger individual—

there is no requirement that the younger individual take over all of the plaintiff's former job duties.[106] The Court therefore finds sufficient evidence to establish that Plaintiff was "replaced" by a younger individual and that this prong of the prima facie case has been met.

■ Third and finally, the County argues Plaintiff cannot establish a prima facie case because she cannot show she was doing satisfactory work. In this circuit, very little is required for a plaintiff to satisfy the "satisfactory work" prong of the prima facie case. A plaintiff may make out a prima facie case of discrimination in a discharge case merely "by [presenting] credible evidence that she continued to possess the objective qualifications she held when she was hired, or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she had held her position for a significant period of time."[107] The court is not allowed to consider the employer's explanation that it discharged the plaintiff due to unsatisfactory work in assessing whether the plaintiff has established a prima facie case.[108]

Applying this minimal standard, the Court finds Plaintiff has shown she was "doing satisfactory work." She has therefore satisfied this prong of her prima facie case.

The Court now must determine whether the County has articulated legitimate, non-discriminatory reasons for its actions. For the reasons discussed above in connection with Plaintiff's ADA retaliation claim,[109]

---

**106.** *Bedell v. Am. Yearbook Co.,* 17 F.Supp.2d 1227, 1232 (D.Kan.1998) (evidence that younger employee was trained to perform at least a portion of plaintiff's duties was sufficient for prima facie showing that plaintiff was "replaced" by younger individual).

**107.** *MacDonald v. East. Wy. Mental Health Ctr.,* 941 F.2d 1115, 1121 (10th Cir.1991) (citations omitted).

**108.** *Ellis v. United Airlines, Inc.,* 73 F.3d 999, 1005 n. 8 (10th Cir.1996) (citing *MacDonald,* 941 F.2d at 1121).

**109.** *See* Part III.C.4.a., *supra.*

the Court holds that the County has articulated legitimate, non-discriminatory reasons for the adverse employment actions it took against Plaintiff. It is now up to Plaintiff to show that age was a determinative factor in the County's employment decisions or that the County's explanation was merely a pretext for age discrimination.

Plaintiff has failed to present any evidence whatsoever that age was a determinative factor in her termination. Instead, Plaintiff asserts the County's stated reasons for her termination are pretextual. In support, she attempts to show that the County did not follow its own progressive discipline policy in discharging her and that the County's employees gave differing reasons for her termination. The Court has already rejected these assertions in connection with Plaintiff's ADA retaliation claim, and, for the same reasons discussed above, rejects them again here, in the context of Plaintiff's ADEA claim.

■■■ Plaintiff also asserts that the County's stated reasons should be deemed pretextual because the County accused Hutcheson of the same conduct as Plaintiff, yet Hutcheson's employment was never terminated. The Court rejects this assertion for the very same reasons discussed above with respect to Plaintiff's ADA claims. In addition, the Court must reject this contention because Plaintiff has not shown that Hutcheson was younger than she. For purposes of showing discriminatory intent in an age discrimination case, the plaintiff must show that the comparable employee is younger than the plaintiff.[110] Otherwise, no inference of age discrimination is even raised. Here, the evidence shows Hutcheson was

much older than Plaintiff. In January 1999, Hutcheson was 63 years old, while Plaintiff was only 46 years old, Thus, any comparison to Hutcheson does not support Plaintiff's pretext claim. Quite to the contrary, it cuts against any inference of pretext.

The Court finds Plaintiff has submitted nothing more than speculation in support of her claim that the County's stated reasons for her termination are pretextual and that age played a role in her termination. Plaintiff never heard McKenzie, Hutcheson, Sullivan, or Murphy make any comments that she thought indicated a bias against older employees. No one told Plaintiff she was being terminated in whole or in part because of her age. Mere conjecture that the employer's explanation is pretextual is an insufficient basis for denying summary judgment.[111] The Court will therefore grant the County's motion for summary judgment on Plaintiff's ADEA claim.

### E. Breach of Implied Employment Contract

Plaintiff contends the County's Disciplinary Action Policy formed the basis of an implied contract, which the County breached when it initiated the discipline process against her with a Second Warning without first giving her an Oral Warning and a First Warning. She also claims she had an implied employment contract with the County that provided she could only be terminated for cause. She contends the County breached that contract by terminating her employment without good cause.

■■■ It is well settled under the employment-at-will doctrine in Kansas that

**110.** *See Long v. Owens Corning,* 214 F.Supp.2d 1124, 1129 (D.Kan.2002) (to prevail on ADEA claim, plaintiff "must show facts which demonstrate that defendant treated similarly situated *younger* employees more favorably" than plaintiff) (emphasis added).

**111.** *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988).

employment is terminable at the will of either the employer or the employee for good cause or no cause at all.[112] Kansas courts have developed a narrow exception to the employment-at-will doctrine, an exception which provides that an employer may not treat employment as at-will when the parties have entered into an implied agreement to the contrary.[113]

■ The Tenth Circuit has summarized Kansas law regarding implied employment contracts, as follows:

> Whether an implied-in-fact contract exists is a question of fact. A mutual intent to form a contract is necessary to show that an implied-in-fact contract exists. A unilateral expectation on the part of the employee does not create an implied-in-fact contract for continued employment. A reasonable person must be able to find from all relevant circumstances of the plaintiff's employment that there was an intent on both sides to be bound.[114]

■ Factors the court should consider when determining whether the parties had a mutual intent to form a contract include the following:

> [The] written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other

circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.[115]

■ The question of whether an implied contract exists under Kansas law is typically a question of fact for the jury.[116] Summary judgment is not precluded, however, where there is no showing of liability as a matter of law, there are no essential facts in dispute, and "the plaintiff presents only evidence of his own unilateral expectations of continued employment."[117]

In light of the above, the ultimate issue here is whether the totality of circumstances supports a finding that the parties objectively manifested their intent to alter the at-will employment relationship.

**1. Contract based on the Disciplinary Action Policy**

■ In support of her claim that the Disciplinary Action Policy created a contract, Plaintiff presents testimony from three Health Department employees regarding their view of the disciplinary process. Victoria Hanley, who was a Field Services Coordinator with the Health Department, testified she would never skip the Oral Warning and First Warning and go right to the Second Warning. She testified that "in all fairness to the employee, they have a right to know that this is-consider this an oral warning followed-just mere human courtesy." She also testified that "I think it boils down to management

---

**112.** *See Johnson v. Nat'l Beef Packing Co.*, 220 Kan. 52, 54, 551 P.2d 779 (1976).

**113.** *See, e.g., Morriss v. Coleman Co.*, 241 Kan. 501, 509, 738 P.2d 841 (1987).

**114.** *Panis v. Mission Hills Bank*, 60 F.3d 1486, 1492 (10th Cir.1995) (citations omitted).

**115.** *Morriss*, 241 Kan. at 513, 738 P.2d 841 (quoting *Allegri v. Providence–St. Margaret*

*Health Ctr.*, 9 Kan.App.2d 659, 659 (syl.), 684 P.2d 1031 (1984)).

**116.** *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 537 (10th Cir.1995).

**117.** *Kastner v. Blue Cross & Blue Shield of Kan., Inc.*, 21 Kan.App.2d 16, 24, 894 P.2d 909 (1995) (quoting *Conyers v. Safelite Glass Corp.*, 825 F.Supp. 974, 977 (D.Kan.1993)).

style" and that the course of discipline taken "just depends on what the situation is and I think you have to act accordingly with what policy is in place."

The Court does not find Hanley's testimony supports Plaintiff's contention that the Disciplinary Action Policy rose to the level of a contract requiring the County to give Plaintiff an Oral Warning and a First Warning before giving her a Second Warning. If anything, Hanley's testimony supports the County's position that the Disciplinary Action Policy was not a legally binding contract but rather a set of guidelines that could be followed depending on the seriousness of the employee's misconduct.

Plaintiff also presents the testimony of McKenzie and Sullivan in support of her claim that the Disciplinary Action Policy created a contract. McKenzie testified that, other than in Plaintiff's case, she had never disciplined an employee without going through all of the steps set forth in the Disciplinary Action Policy. In addition, Sullivan testified she always followed the steps of Oral Warning, First Warning, and Second Warning in disciplining employees. No evidence is presented to the Court, however, regarding the number of employees McKenzie and Sullivan have disciplined or the seriousness of the misconduct as compared to Plaintiff's misconduct. The fact that McKenzie and Sullivan went through all steps of the Disciplinary Action Policy in those particular situations does not, in itself, mean the County intended all progressive steps of the Disciplinary Action Policy to be followed in all situations.

In fact, as noted above in Part III.C.4.b., the Disciplinary Action Policy is discretionary and allows the County to by-pass the first three warnings when the nature of the misconduct is severe.[118]

Finally, Plaintiff asserts she attended a County-sponsored workshop on progressive discipline where the participants were told "there would be progressive discipline in terms of evaluation and ... termination." The participants were also told that managers should have reasons for any disciplinary action taken. The Court does not find this evidence supports Plaintiff's claim that the Disciplinary Action Policy created a contract such that each of its steps was required to be taken. This is particularly true given that the Personnel Manual, in which the Disciplinary Action Policy was contained, expressly states that "[t]he procedures and guidelines established by these policies shall not constitute nor be considered as an employment contract." [119]

In short, the evidence submitted by Plaintiff is simply not enough to support a finding that the parties objectively manifested an intent for the Disciplinary Action Policy to form a legally binding contract between Plaintiff and the County. At most, Plaintiff has presented evidence of a progressive discipline policy, the steps of which may or may not be followed depending on the circumstances.

It is well established that a written personnel policy, which is not bargained for, is not alone sufficient to establish an implied contract.[120] As Judge

---

**118.** As noted above, Paragraph A.2 of the Disciplinary Action Policy states that if the nature of the employee misconduct is severe, the first three disciplinary steps "may be by-passed." It further states that for less serious offenses or for repetitive problems, the first three steps "may be more appropriate."

**119.** Personnel Manual, Policy No. 124, Employment Relationship Policy.

**120.** *See Wulf v. City of Wichita*, 644 F.Supp. 1211, 1221–22 (D.Kan.1986), *aff'd in part, rev'd in part on other grounds*, 883 F.2d 842 (10th Cir.1989) (the Kansas rule remains that an employment manual, which is only a unilateral expression of company policy and is

Lungstrum stated in *Berry v. General Motors Corp.*,[121] "[t]here is a distinct difference between a policy which a given employer might adopt and sincerely intend to follow, and normally does follow, and a binding contractual duty. An employer may adopt a policy to bring clarity, or predictability, or even a sense of fairness to the employment relationship without intending to be contractually bound by it."[122] Plaintiff has not produced sufficient evidence to show that the County's intent was anything other than to have in place non-binding management guidelines regarding discipline. Because her evidence is insufficient to persuade a reasonable jury that a contract of employment existed, her claim for breach of implied contract based on the Disciplinary Action Policy cannot survive summary judgment.

Even if the Court were to find that the Disciplinary Action Policy did form the basis of a contract, the Court would find no breach of contract. As discussed above with respect to pretext,[123] the Court does not find the County's alleged failure to give Plaintiff an Oral Warning and First Warning before giving her the Second Warning was a violation of the Disciplinary Action Policy. The Policy uses sufficient discretionary language to allow the County to by-pass certain warnings.[124] It expressly states that if management determines the nature of the employee misconduct to be severe, management may by-pass the first three disciplinary steps. McKenzie testified that she discussed the matter with her superiors, Sullivan and Hutcheson, and Baugus of the County's Human Resources Department, and they determined that Plaintiff's misconduct was severe enough that a Second Warning was warranted and that the oral warning and First Warning could be by-passed. Thus, the County's failure to give Plaintiff an Oral Warning and First Warning did not amount to a breach of contract. For this additional reason, the County is entitled to summary judgment on Plaintiff's claim for breach of the Disciplinary Action Policy.

### 2. Contract requiring termination for cause

▮ Plaintiff next claims she had an implied contract requiring that any termination of her employment to be for cause only. She contends the County breached that contract by terminating her employment without good cause. The County moves for summary judgment on this claim on the basis that it had in place policies which stated that employees were employed at the will of the County. Specifically, Policy No. 124 of the Personnel Manual provides that employment with the County is at-will and that employees are subject to termination at any time with or without cause.[125] In addition, the County's "Employee Orientation Program" binder provides that all employment with the County "shall be employment-at-will, subject to release at any time." The binder states that "[n]o person shall be considered to have tenured employment with the

---

not bargained for, cannot alone form the basis of an employment contract); *Rouse v. Peoples Natural Gas Co.*, 605 F.Supp. 230, 232 (D.Kan.1985) (representations in an employment manual alone are insufficient to form the basis for an implied contract of employment); *Brown v. United Methodist Homes for Aged*, 249 Kan. 124, 138, 815 P.2d 72 (1991) (written personnel policy alone is insufficient to establish an implied contract of employment of a term of specific duration).

121. 838 F.Supp. 1479 (D.Kan.1993), *aff'd*, 56 F.3d 1233 (10th Cir.1995).

122. *Id.* at 1492.

123. *See* Part III.C.4.b., *supra*.

124. *See* Personnel Manual, Policy No. 618, Disciplinary Action Policy, ¶ A.2,

125. Personnel Manual, Policy No. 124, Employment Relationship Policy.

County nor any expectation of continued or permanent employment."

■■■■ It is well established that disclaimers of this nature are probative of whether an implied employment contract was formed; however, the disclaimer does not, as a matter of law, always determine the issue.[126] For the disclaimer to be determinative, the evidence must show that the plaintiff actually read the disclaimer or that it was otherwise brought to the plaintiff's attention.[127] Also, the disclaimer must not be inconsistent with statements made by the defendant to its employees.[128]

Here, the evidence shows Plaintiff never received a copy of the Personnel Manual containing the disclaimer language. While she did receive the "Employee Orientation Program" binder containing the employment-at-will disclaimer, there is no evidence showing that Plaintiff ever read the disclaimer or that it was otherwise personally brought to her attention. The disclaimer is therefore not determinative, as a matter of law, as to whether an implied contract existed.

■■■ To prevail on her implied contract claim, Plaintiff must show that her supervisors or others in County management made statements to employees which were inconsistent with the disclaimer or provide some other evidence under the factors set forth in *Morriss*,[129] showing that the parties intended to enter into a binding contract which required Plaintiff to be terminated only for cause.

To meet this burden, Plaintiff asserts she believed that as long as she performed her job according to her job description, she would continue to be employed by the County. She also asserts that it was the understanding of all the nurses and nurse practitioners at the Health Department that they would continue to be employed by the Health Department as long as they performed their job satisfactorily. In support of this sweeping assertion, Plaintiff presents the affidavits of three Health Department nurses (Cheryl Newell, Carole Walters, and Sandy Hinds), each of whom states that it was her understanding, and the understanding of others at the Health Department, that as long as they performed their jobs satisfactorily they would continue to be employed by the Health Department.

Neither Plaintiff nor any of the affiants presents any evidence upon which these expectations were based. At most, this "evidence" only shows that Plaintiff and these three nurses had unilateral expectations of continued employed. As noted above, such unilateral expectations are in-

**126.** *See Morriss v. Coleman Co.*, 241 Kan. 501, 513–14, 738 P.2d 841, 849 (1987).

**127.** *Henderson v. Montgomery County, Kan. Bd. of County Comm'rs*, 213 F.Supp.2d 1262, 1278 (D.Kan.2002) (fact that plaintiff read the contents of employee handbook, including the disclaimer language, "severely undercut" plaintiff's implied employment contract); *Morriss*, 241 Kan. at 513–14, 738 P.2d 841 (disclaimer in supervisor's manual was not determinative as a matter of law as to whether implied contract was formed where it was not established that the disclaimer was brought to the personal attention of the plaintiff); *Kastner v. Blue Cross and Blue Shield of Kan., Inc.*, 21 Kan.App.2d 16, 28–29, 894 P.2d

909 (1995) (where plaintiff admitted reading a disclaimer stating that the policies of the employee manual were not intended to create an implied contract, the disclaimer was dispositive of the question of whether the employer intended to form a contract with plaintiff).

**128.** *Morriss*, 241 Kan. at 513–14, 738 P.2d 841 (trial court erred in granting employer summary judgment where evidence did not establish that disclaimer was brought to plaintiff's personal attention and where disclaimer · was inconsistent with statements made by supervisors to employees).

**129.** 241 Kan. at 512, 738 P.2d 841.

sufficient to create an implied-in-fact contract.[130]

Next, Plaintiff presents the deposition testimony of McKenzie, Baugus, Sullivan, and Hanley to support her contract claim. McKenzie testified she had never terminated any Health Department employee without a reason and she was not aware of any Health Department employee who had been terminated for no reason. She also testified she had never terminated any nurse practitioner at the Health Department who was outside the probationary period. Baugus testified that the purpose of the due process hearing is to determine if there is a good reason for taking action against the employee and that terminations by the County were "for-cause terminations." Sullivan testified she had never terminated anyone without reason and that she would not have terminated Plaintiff without a good reason. Finally, Hanley testified that pursuant to the County's policy, an employee must have "gone through" the discipline policy before being terminated and that the County had to have a good reason to terminate. In Hanley's "estimation," the County's employment-at-will policy was in conflict with the County's "day-to-day"policy that good cause was needed to terminate an employee.

Again, the Court does not find this evidence supports Plaintiff's implied contract claim. There is no testimony that any of these employees ever told Plaintiff she had a right to progressive discipline before termination or that she would not be terminated without good cause. Nor is there any testimony that any of these employees ever told Plaintiff that County employees in general had a right to progressive discipline or the right to be terminated only for cause. Furthermore, the record does not reveal that anyone else in management at the County made any representations to Plaintiff of this type. The above-cited testimony only reflects that employees of the County are generally not terminated unless the County has a reason to do so. In short, this testimony reflects what the general practice was, and not what was represented to employees or Plaintiff as to what the County's policies, practices, or obligations were.

Finally, Plaintiff asserts certain provisions of the Personnel Manual are consistent with her understanding that she could only be terminated for cause. These provisions are as follows: (1) "Such aspects of the employment process including, but not limited to ... discipline, termination ... will be based solely on merit or the ability of the applicant or employee;"[131] (2) "An employee who has completed the initial performance trial period will be subject to the disciplinary process;"[132] and (3) "Employment by the County is *not* a right. Persons ... employed by the County are required to accept certain responsibilities in their roles as employees of and representatives of the citizens and residents of Johnson County. Failure to meet those responsibilities in servicing the public shall be cause for disciplinary action and/or termination of employment when appropriate."[133]

The Court does not find these provisions sufficient to show the County intended to enter into a contract with Plaintiff provid-

130. *Panis v. Mission Hills Bank*, 60 F.3d 1486, 1492 (10th Cir.1995) (citations omitted) (applying Kansas law).

131. Personnel Manual, Policy No. 206, Equal Employment Opportunity Affirmative Action Policy.

132. *Id.*, Policy No. 272, Separation Policy.

133. *Id.*, Policy No. 530, Employee Responsibilities Policy.

ing her employment could only be terminated for cause, particularly in light of the Manual's express statement that "[t]he procedures and guidelines established by these policies shall not constitute nor be considered as an employment contract." [134]

In sum, the record is devoid of evidence establishing that Plaintiff enjoyed an implied contract that she could only be terminated for cause. At most, Plaintiff has only shown that she, and some other employees in the Health Department, had unilateral expectations of continued employment. Because Plaintiff has failed to meet her burden to come forward with evidence of disputed material facts regarding the formation of this alleged contract, summary judgment in favor of the County on this claim is appropriate.

## F. Retaliatory Discharge

Plaintiff seeks to recover under Kansas law for retaliation. She states in the Pretrial Order that the County took adverse employment actions against her "in retaliation for Plaintiff's protesting and reporting what Plaintiff, in good faith, believed were unethical, unprofessional, and illegal practices by the County." The Court notes, however, that Plaintiff has limited her summary judgment discussion to her discharge and that she refers to her claim as one for "retaliatory discharge." The Court thus presumes Plaintiff has abandoned any state law retaliation claims she may have had that relate to any adverse employment actions other than her discharge.

## 1. Is the County immune from suit under the Kansas Tort Claims Act?

As a threshold matter, the Court must determine whether Plaintiff's retaliatory discharge/whistleblowing claim is barred by the Kansas Tort Claims Act. The County contends it is immune from suit for such claims under K.S.A. 75–6104(e). That statute provides in relevant part:

A governmental entity . . . shall not be liable for damages resulting from:

e. any claim based upon the exercise of performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved. [135]

 The Court must determine whether the County's alleged retaliatory discharge falls within the discretionary function exception to the Kansas Tort Claims Act. Before answering this question, the Court first recognizes the Kansas Supreme Court's admonition that "[t]he Kansas Tort Claims Act is an open-ended act making governmental liability the rule and immunity the exception." [136] The Court also notes that the burden is upon the defendant governmental entity to establish immunity under one or more of the exceptions of K.S.A. 75–6104. [137]

 The Court has not found, and the parties have not cited, any Kansas case involving application of the discretionary function exception to a Kansas common law retaliatory discharge or whistleblower claim. There are several general princi-

134. *Id.*, Policy No. 124, Employment Relationship.

135. K.S.A. 75–6104(e).

136. *Nichols v. Unified Sch. Dist. No. 400*, 246 Kan. 93, 95, 785 P.2d 986 (1990) (citing

*Dougan v. Rossville Drainage Dist.*, 243 Kan. 315, 318, 757 P.2d 272 (1988)).

137. *Kansas State Bank & Trust Co. v. Specialized Transp. Services, Inc.*, 249 Kan. 348, 364, 819 P.2d 587 (1991).

ples, however, that are applicable here. First, the "nature and the quality of the discretion" must be of the type that the Kansas Legislature intended to put beyond judicial review.[138] The "mere exercise of some judgment cannot be the test for a discretionary function because judgment is exercised in almost every human endeavor."[139] "The more a judgment involves the making of policy the more it is of a 'nature and quality' to be recognized as inappropriate for judicial review."[140] Second, the discretionary function exception is not applicable in those situations where a legal duty exists, either by case law or by statute.[141] A governmental agency may not properly claim that its challenged action falls within the discretionary function exception where the action taken violates a legal duty.[142]

 Applying these principles here, the Court concludes the County may not rely upon the discretionary function exception to the Kansas Tort Claims Act. The Court does not find that the County's decision to terminate Plaintiff's employment involved the making of any type of policy. Furthermore, although the County's management clearly exercised judgment and discretion in deciding to terminate Plaintiff, the County did not exercise the type of governmental discretion that the Kansas Legislature intended to shield from review by the courts. Finally, the County had a legal duty to refrain from retaliating against employees for reporting alleged violations of the law relating to public health, safety or general welfare.[143] The Court therefore holds that the County is not immune from suit for retaliatory discharge under the discretionary function exception to the Kansas Tort Claims Act.

## 2. Is the County entitled to summary judgment on Plaintiff's retaliatory discharge claims?

Plaintiff advances two theories in support of her retaliatory discharge claim. First, Plaintiff asserts she was discharged in retaliation for exercising her rights and responsibilities under the Kansas Nurse Practice Act.[144] Second, Plaintiff asserts she was discharged in retaliation for whistle blowing, i.e., (1) reporting to Hutcheson the alleged "substandard care being given to [Doe] by the Health Department;"[145]

138. *Id.*

139. *Id.*, 249 Kan. at 365, 819 P.2d 587 (internal quotations and citations omitted).

140. *Id.*

141. *Nero v. Kansas State Univ.*, 253 Kan. 567, 587–88, 861 P.2d 768 (1993) (governmental entity sued for negligence could not rely on discretionary function exception where it built and maintained housing units, because it had a legal duty to use reasonable care to protect the occupants from foreseeable criminal conduct); *See also Conchola v. Kansas City, Kan. Police Dep't*, No. Civ. A. 98–2155–GTV, 1999 WL 183931, at *1 (D.Kan. Mar.31, 1999) (because governmental entity has legal duty to refrain from discrimination in violation of Kansas Act Against Discrimination, discretionary function exception does not apply to discrimination claim); *State of Kan. ex*

*rel. Franklin v. City of Topeka*, 266 Kan. 385, 391, 969 P.2d 852 (1998) (same).

142. *Nero*, 253 Kan. at 587, 861 P.2d 768.

143. *See generally* discussion regarding whistleblower claims, Part III.F.2.b.(1), *infra.*

144. K.S.A. 65–1113, *et seq.* Plaintiff makes reference to the "Kansas Advanced Nurse Practice Act." Plaintiff does not provide any statutory citations and instead cites to certain Kansas Administrative Regulations promulgated pursuant to the Kansas Nurse Practice Act. The Court can locate no act entitled "Kansas Advanced Nurse Practice Act." The Court therefore assumes Plaintiff is relying on the Kansas Nurse Practice Act and those sections of the Act that apply to advanced registered nurse practitioners.

145. Pltf's Legal Mem., Doc. 111 at p. 37.

and (2) reporting to various state and federal agencies "the substandard care and illegal behavior by Ms. Hutcheson." [146]

### a. Retaliation based on the exercise of her rights and responsibilities under the Kansas Nurse Practice Act

As noted above, Plaintiff contends she was wrongfully discharged based on the exercise of her rights and the performance of her responsibilities under the Kansas Nurse Practice Act. More specifically, Plaintiff asserts she had the right and duty during the January 21, 1999 client care conference to intervene in Doe's care to protect Doe, Doe's unborn child, and the children and employees of the day care facility where Doe worked. Plaintiff also contends she had the right and responsibility to disagree with Hutcheson's decision that Doe would be referred back to the HIV Case Manager for care. Plaintiff contends she was discharged for doing these things.

Kansas recognizes exceptions to the employment-at-will doctrine where an employee is terminated in violation of public policy. [147] This includes an exception made for the termination of an employee in retaliation for the exercise of rights

under the Kansas workers' compensation laws [148] and the Kansas unemployment compensation laws. [149]

This Court has found no case in which a court has applied Kansas law to recognize a retaliatory discharge cause of action based on an employee exercising her rights or performing her responsibilities under the Kansas Nurse Practice Act, and Plaintiff has not directed the Court to any such case law. [150] The Court must therefore, as a threshold matter, examine the Kansas Nurse Practice Act and determine (1) what rights and responsibilities Plaintiff exercised under that Act, and (2) whether Kansas state courts would find that a strong and well-established public policy supports the exercise of those rights and responsibilities such that a cause of action for retaliatory discharge should be recognized in these circumstances.

In support of retaliatory discharge claim, Plaintiff does not cite any specific statutory provision of the Nurse Practice Act. Rather, Plaintiff directs the Court to various Kansas Administrative Regulations of the Kansas State Board of Nursing, which were promulgated pursuant to the Nurse Practice Act. [151] Those regulations are as follows:

---

**146.** *Id.*

**147.** *See, e.g., Allegri v. Providence–St. Margaret Health Ctr.*, 9 Kan.App.2d 659, 664, 684 P.2d 1031 (1984) (noting that "in proper circumstances an employee at will ... may bring a tort action for retaliatory discharge when the termination is based on retaliation constituting a contravention of public policy.") (citations omitted).

**148.** *See., e.g., Murphy v. City of Topeka–Shawnee County Dept. of Labor Services*, 6 Kan. App.2d 488, 495–96, 630 P.2d 186 (1981) (recognizing cause of action for retaliatory discharge where employer fires employee for filing workers' compensation claim).

**149.** *See, e.g., Koehler v. Hunter Care Ctrs., Inc.*, 6 F.Supp.2d 1237, 1242 (D.Kan.1998) (recognizing retaliatory discharge cause of action

where employer terminates employee for filing claim for unemployment compensation benefits); *Kistler v. Life Care Ctrs. of America, Inc.*, 620 F.Supp. 1268, 1270 (D.Kan.1985) (recognizing retaliatory discharge cause of action where employer terminates employee for testifying at unemployment compensation hearing).

**150.** Plaintiff merely cites to a Kansas Pattern Jury Instruction which instructs that an employee may recover for retaliatory discharge if "[t]he employee exercised (his)(her) statutory right to (insert language of relevant statutory rights)." P.I.K.124.56, Pattern Instructions Kansas Civil 3d.

**151.** *See* K.S.A. 65–1129 (authorizing Kansas State Board of Nursing to adopt and promulgate rules and regulations necessary to carry out the provisions of the Nurse Practice Act).

"Advanced registered nurse practitioners shall be authorized to make independent decisions about nursing needs of families and clients, and interdependent decisions with physicians in carrying out health regimens for families and clients." [152]

Advanced registered nurse practitioners shall be directly accountable and responsible to the consumer. [153]

Advanced registered nurse practitioners function in the expanded role of nurse clinician or nurse practitioner, at a specialized level, through the application of advance knowledge and skills. Each ... nurse practitioner shall be authorized to: ...

(d) plan, implement and evaluate care; [and]

(e) consult with the client and members of the health care team, to provide for acute and ongoing health care or referral of the client ..." [154]

The primary responsibility of the advanced registered nurse practitioner performing in the expanded role of clinical nurse specialist shall be patient care delivery to a select population in a specialty area. Each clinical nurse specialist shall be authorized to:

(a) provide direct nursing care utilizing a broad base of advanced scientific knowledge, nursing theory and skills in assessing, planning, implementing, and evaluating those aspects of health and nursing care of individuals who require this specialized competence;

(b) provide indirect nursing care. Each clinical nurse specialist shall plan, guide, evaluate and direct the nursing care given by other personnel associated with the nursing functions;

(c) conduct nursing research. Each clinical nurse specialist shall create and test methods of nursing intervention and health care in the area of specialization;

(d) teach and counsel individuals or groups. Each clinical nurse specialist shall utilize theories and skills of communication and teaching learning process to increase the knowledge or functioning of individuals and groups, nursing personnel, students and other members of the health care team;

(e) serve as a consultant, and as a resource, utilizing advanced health knowledge and skills, to those who are directly and indirectly involved in patient care; and

(f) participate in periodic evaluation of services rendered, including, but not limited to, chart reviews, case reviews, patient evaluations, and outcome of case statistics. [155]

Plaintiff does not elaborate or explain in what way she allegedly "exercised her rights" under these regulations or how she allegedly "performed these responsibilities" during the January 21, 1999 client care conference.

The Court does not find that the above-cited regulations confer any rights on Plaintiff. Thus, the Court cannot find Plaintiff "exercised any rights" thereunder so as to give rise to a retaliatory discharge claim based on the exercise of any statutory rights. As noted above, Kansas courts have recognized a cause of action for retaliatory discharge in the context of an employee exercising his right under the workers' compensation laws to file a claim for benefits, [156] exercising his right under the unemployment compensation laws to file a claim for unemployment benefits, [157] or ex-

152. K.A.R. 60–11–101.

153. *Id.*

154. K.A.R. 60–11–104.

155. K.A.R. 60–11–107.

156. *See Murphy,* 6 Kan.App.2d at 495–96, 630 P.2d 186.

157. *See Koehler,* 6 F.Supp.2d at 1242.

ercising his right to testify at an unemployment compensation hearing.[158] In all of those cases, there was an express right of which the plaintiff availed himself. There simply is no such right under the regulations cited by Plaintiff. The Court therefore holds that the County is entitled to summary judgment on Plaintiff's claim that she was wrongfully discharged for exercising rights under the Kansas Nurse Practice Act.

Turning now to Plaintiff's claims that she was wrongfully discharged for performing her responsibilities under the Nurse Practice Act, the Court first notes that many of the cited regulations impose no specific duties or responsibilities on Plaintiff but rather merely *authorize or give Plaintiff permission* to perform certain functions. The Court can conceive of no way in which a retaliatory discharge claim could be based on an employee performing services that are merely permitted by law.

On the other hand, the Court does find that some of the regulations set forth certain general responsibilities for Advanced Registered Nurse Practitioners. The regulations state that the advance registered nurse practitioner "shall" (1) be accountable and responsible to the consumer;[159] (2) deliver patient care to a select population in a specialty area;[160] (3) plan, guide, evaluate and direct the nursing care given by other personnel associated with the nursing functions;[161] (4) create and test methods of nursing intervention and health care in the area of specialization;[162] and (5) utilize theories and skills of communication and teaching learning process to increase the knowledge or functioning of nursing personnel, students and other members of the health care team.[163]

Notwithstanding this mandatory language, the Court does not find that Kansas law would recognize a retaliatory discharge cause of action based on an employee's performance of these responsibilities. As noted above, the Court has found no case recognizing a cause of action relating to an employee's exercise of rights or performance of responsibilities under the Kansas Nurse Practice Act or its regulations. Even more importantly, the Court has found no Kansas case recognizing a cause of action for retaliatory discharge based on an employee's performance of any responsibility or duty under *any* statute or set of regulations. The cases thus far have been limited to an employee exercising a statutory right or an employee reporting to management or law enforcement officials a serious infraction of rules or law pertaining to public health, safety, or the general welfare.[164] Thus, the Court would be creating a new cause of action here.

The tort of retaliatory discharge is an exception to, and in mitigation of, the longstanding principle that an at-will employee may be terminated at any time, with or without cause.[165] The exception applies only when the discharge from employment has seriously contravened a very clear public policy.[166] Thus, before recog-

---

158. *See Kistler,* 620 F.Supp. at 1270.

159. K.A.R. 60–11–101.

160. K.A.R. 60–11–107.

161. K.A.R. 60–11–107(b).

162. K.A.R. 60–11–107(c).

163. K.A.R. 60–11–107(d).

164. *Palmer v. Brown,* 242 Kan. 893, 900, 752 P.2d 685 (1988).

165. *Morriss v. Coleman Co.,* 241 Kan. 501, 511, 738 P.2d 841 (1987).

166. *Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 177, 872 P.2d 252 (1994); *Cain v. Kansas Corp. Comm'n,* 9 Kan.App.2d 100, 103–104, 673 P.2d 451 (1983).

nizing a new cause of action for retaliatory discharge based on an employee's fulfilling of her responsibilities under the above-cited regulations, this Court "would have to determine that some strong public policy required it." [167]

■ The Kansas Supreme Court has made it clear that this is a very hard test to satisfy. In *Palmer v. Brown*,[168] the Kansas Supreme Court ruled that before a court is justified in declaring the existence of public policy that would support a retaliatory discharge claim, the court must find the public policy is "so throughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt." [169] Such a strong public policy may be evidenced by legislative guidance, for example, where a state statute makes it unlawful for an employer to terminate an employee because of testimony given at a workers' compensation hearing.[170] No such legislative enactment or other strong public policy exists here.

Even if the Court were to find that public policy supports the recognition of a new retaliatory discharge cause of action based on an employee's performance of her duties under the Kansas Nurse Practice Act, the Court would not find the elements of such a claim to be satisfied here. Plaintiff has not established that Doe was under her care or that Doe was a patient of the Health Department's Prenatal Program, such that Plaintiff had a legal duty to provide certain care to her. In other words, Plaintiff's claim is not based on any duty to provide certain care to Doe under the Nurse Practice Act, but rather based on her Plaintiff's personal and professional opinion as to how the Health Department should provide care for Doe.

In light of the above, the Court holds that the County is entitled to summary judgment on Plaintiff's claim that the County wrongfully discharged her for performing her responsibilities under the Kansas Advance Nurse Practice Act.

### b. Whistleblower claim

The Court will now examine Plaintiff's whistleblower claim, *i.e.*, Plaintiff's claim that she was discharged in retaliation for reporting certain information to Hutcheson and various state agencies.

### (1) Elements and proof scheme

■ The Kansas Supreme Court has recognized retaliatory discharge for whistleblowing as an exception to the at-will employment doctrine.[171] In *Palmer v. Brown*,[172] the Kansas Supreme Court set forth the basic elements of a retaliatory discharge case based on whistleblowing:

[A]n employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer

---

**167.** *Dickens,* 255 Kan. 164 at 177, 872 P.2d 252.

**168.** 242 Kan. 893, 752 P.2d 685 (1988).

**169.** *Id.,* 242 Kan. at 897, 752 P.2d 685 (citations and internal quotations omitted).

**170.** *See Kistler,* 620 F.Supp. at 1269–70 (recognizing new retaliatory discharge cause of action for firing employee for testifying at workers' compensation hearing; court's holding based on strong public policy evinced by K.S.A. 44–615, which makes it unlawful for employer to terminate employee for giving testimony at workers' compensation proceeding).

**171.** *See, e.g., Ortega v. IBP, Inc.,* 255 Kan. 513, 516–17, 874 P.2d 1188 (1994); *Palmer v. Brown,* 242 Kan. 893, 900, 752 P.2d 685 (1988).

**172.** *Palmer,* 242 Kan. at 900, 752 P.2d 685 (citations omitted).

was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report.[173]

■■■■■ In addition, *Palmer* held the reporting "must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain."[174] Also, the infraction must have been reported to "either company management or law enforcement officials."[175]

■■■■■ Because such claims are rarely proven by direct evidence, Kansas courts have adopted the *McDonnell Douglas*[176] burden-shifting framework for analyzing retaliatory discharge claims.[177] The plaintiff must first establish a prima facie case of retaliation.[178] To establish a prima facie case, the plaintiff must demonstrate that (1) a reasonably prudent person would have concluded that the plaintiff's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; (2) the plaintiff reported to either management or law enforcement that a co-worker or employer was engaged in such activities; (3) the employer had knowledge of the employee's reporting prior to the employee's termination; (4) the plaintiff was terminated subsequent to or contemporaneous with such protected activity; and (5) a causal connection exists between the protected activity and the plaintiff's termination.[179]

Once the employee establishes a prima facie case, the defendant must come forward with legitimate, nonretaliatory reasons for its actions.[180] If the employer meets this burden, the burden then shifts back to the plaintiff, and, to avoid summary judgment, the plaintiff "must assert specific facts establishing a triable issue as to whether the employer's reasons for discharge is a mere cover-up or pretext for retaliatory discharge."[181]

■■■■■ The employee's ultimate burden is to establish retaliation by a preponderance of the evidence, but the evidence must be clear and convincing in nature.[182] This clear and convincing standard is applied at the summary judgment stage-at least when the claim is brought in a federal court sitting in diversity.[183] Evidence is clear "if it is certain, unambiguous, and plain to the understanding," and it is con-

173. *Id.*

174. *Id.*

175. *Id.*

176. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

177. *Foster v. Alliedsignal Inc.,* 293 F.3d 1187, 1193 (10th Cir.2002).

178. *Id.* (citations omitted).

179. *Boe v. AlliedSignal, Inc.,* 131 F.Supp.2d 1197, 1203 (D.Kan.2001); *Glover v. NMC Homecare, Inc.,* 106 F.Supp.2d 1151, 1169 (D.Kan.2000).

180. *Foster,* 293 F.3d at 1193 (citations omitted).

181. *Id.* at 1194.

182. *Id.* (citations and quotations omitted).

183. *Id.* at 1194–95 (although a Kansas state court does not apply the clear and convincing standard at the summary judgment stage of the proceeding, "a plaintiff in federal court who opposes a summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate factfinder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer.")

vincing "if it is reasonable and persuasive enough to cause the trier of facts to believe it."[184] Clear and convincing evidence is "not a quantum of proof, but rather a quality of proof."[185]

(2) Nature of Plaintiff's whistleblower claims

Plaintiff claims two separate reporting incidents resulted in her termination. First, Plaintiff claims she made a report regarding Doe's care to Hutcheson and the other participants during the January 21, 1999 client care conference. Second, Plaintiff claims she made reports to various state agencies some time before March 1, 1999 and informed Sullivan, McKenzie, Murphy, and Baugus of those reports during the March 1 return to work conference. Because each of these alleged reporting incidents involves a different set of facts, the Court will examine each of the incidents separately.

(3) Whistleblower claim based on her report to Hutcheson and others at the January 21 client care conference

 The Court does not find Plaintiff has made out a prima facie case of whistleblower retaliation with respect to the January 21 client care conference. This is true for several reasons. First, Plaintiff

has failed to establish that she reported to management during the client care conference that the Health Department was engaged in any activities in violation of rules, regulations or the law pertaining to public health, safety, or general welfare. At most, Plaintiff expressed her concerns about the treatment of Doe and the Department's communication, or lack thereof, with Doe. Plaintiff then recommended a specific plan of care. When Hutcheson rejected that plan of care and decided to refer the patient back to the care of the nurse in charge of HIV case management, Plaintiff merely stated: "I believe that we need to reach out a hand of compassion to a very troubled, confused, frightened and needy young woman not only for her sake but for the sake of public safety." In short, there is no evidence that Plaintiff actually "reported" any violation of a rule, regulation, or law, let alone "clear and convincing evidence" of such a reporting.[186]

The evidence presented by Plaintiff is more properly characterized as a workplace dispute or "taking a stand" on a patient care issue rather than a report bringing to light illegal conduct. Workplace discussions and disagreements do not give rise to whistleblower claims unless the plaintiff actually reports illegal conduct by the employer or one of the plaintiff's co-workers.[187]

---

184. *Id.* at 1194 (citations omitted).

185. *Id.* (citations omitted)

186. Plaintiff asserts in her legal discussion responding to the County's opening brief that she made other comments during the conference, and she cites to Plaintiff's Statement of Fact 5. That Statement of Fact, however, contains no support for these alleged statements, and the Court has been unable to locate these alleged statements anywhere else in the voluminous record. These alleged statements are therefore not part of the evidentiary record and will not be considered by the Court.

187. *Goenner v. Farmland Indus., Inc.,* 175 F.Supp.2d 1271, 1280 (D.Kan.2001) (distin-

guishing workplace dispute from report of illegal activity made to management or law enforcement officials); *Boe v. AlliedSignal, Inc.,* 131 F.Supp.2d 1197, 1204 (D.Kan.2001) (distinguishing an employee who voices a disagreement with management and "takes a stand" from one who reports illegal conduct to seek intervention from management or law enforcement); *Fowler v. Criticare Home Health Servs., Inc.,* 27 Kan.App.2d 869, 876, 10 P.3d 8 (2000) ("*Palmer* simply was not meant to endow every workplace dispute ... on company practices and the effect of government regulation with whistleblower overtones."), *aff'd,* 271 Kan. 715, 26 P.3d 69 (2001).

■ Also, to the extent Plaintiff's claim is based on her objection to Hutcheson's decision regarding the plan of care for Doe, Plaintiff cannot satisfy the requirement that the report of illegal activity be made to a higher authority than the wrongdoer or to law enforcement officials.[188] Because Hutcheson was the one who made the decision regarding Doe's care, any objection or complaint that Plaintiff made to Hutcheson herself or to Hutcheson's subordinates would not qualify as a report to higher management or to law enforcement. An employee who desires whistleblower protection "must seek out the intervention of a higher authority, either inside or outside of the company." [189]

For these reasons, the Court holds that Plaintiff has not sustained her burden of establishing a prima facie case of whistleblower retaliation with respect to the January 21 client care conference. Even if the Court were to find Plaintiff had established a prima facie case, she has not shown that the County's stated reasons for terminating her were pretextual. As discussed in detail in Part III.C.4.a., *supra*, the County has articulated legitimate, nonretaliatory reasons for Plaintiff's termination. Plaintiff has not met her burden to show those reasons were pretextual. The Court therefore holds that the County is entitled to summary judgment on Plain-

tiff's whistleblower claim based on the objections Plaintiff raised at the January 21 client conference.

(4) Whistleblower claim based on reports made to outside agencies

■ The Court also holds Plaintiff has failed to make out a prima facie of whistleblower retaliation with respect to the reports she made to the Kansas Board of Nursing and other various agencies. More specifically, the Court finds Plaintiff has failed to establish exactly what she reported to these agencies. The record reveals only that she reported "the incident with Ms. Hutcheson." [190] Thus, there is no evidence, let alone "clear and convincing" evidence, to show Plaintiff reported to any outside agency that a co-worker or her employer was engaged in any activities in violation of rules, regulations, or the law pertaining to public health, safety, or the general welfare.[191]

Even if the Court were to find that Plaintiff had made a sufficient report of illegal activity to these agencies so as to satisfy her prima facie case, the Court would still find that Plaintiff has failed to show that the legitimate, nonretaliatory reasons stated by the County for her termination were pretextual. The Court will therefore grant summary judgment in fa-

---

**188.** *Goenner,* 175 F.Supp.2d at 1280 (plaintiff must report illegal activity to someone in authority above the wrongdoer).

**189.** *Fowler,* 27 Kan.App.2d at 876, 10 P.3d 8.

**190.** In her affidavit, Plaintiff states she informed McKenzie, Sullivan, Murphy, Baugus, and Dr. Glass at a meeting on March 1, 1999 that she had reported "the incident with Hutcheson" to the Kansas State Board of Nursing, the Kansas Nurses Association, the Kansas Department of Health and Environment, and the U.S. Department of Health and Human Services. She also states in her affidavit that she "believes" her termination

"was motivated by [her] objection and refusal to concede to, and [her] reporting of, a plan of care that she felt was inadequate, unprofessional, and illegal." This is nothing more than Plaintiff's *belief* about why she was terminated, and is *not evidence* to establish Plaintiff ever reported to these agencies that the Health Department or Hutcheson was implementing an illegal plan of patient care.

**191.** *See Boe,* 131 F.Supp.2d at 1203–1204 (prima facie case requires plaintiff to show that plaintiff reported the employer was engaging in activities in violation of rules, regulations, or laws pertaining to public health, safety, and general welfare).

vor of the County on this whistleblower retaliation claim.

### G. Intentional Infliction of Emotional Distress

Plaintiff claims the County intentionally inflicted emotional distress on her by placing her on administrative leave, requiring her to undergo psychiatric testing, and terminating her employment, with that knowledge that Plaintiff "was the victim of a dictatorial supervisory's angry temper and retaliation."

### 1. Is the County immune from suit under the Kansas Tort Claims Act?

■ For many of the same reasons set forth above in Part III.F.1., with respect to Plaintiff's retaliatory discharge claims, the Court concludes the County is not immune from suit for intentional infliction of emotional distress based on the discretionary function exception to the Kansas Tort Claims Act. The Court does not find the County's decision to require Plaintiff to undergo the psychiatric testing, to suspend her, or to terminate her employment involved the making of any type of policy. Furthermore, although the County's management clearly exercised judgment and discretion in deciding to terminate Plaintiff, the County did not exercise the type of governmental discretion that the Kansas Legislature intended to shield from review by the courts.

### 2. Is the County entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim?

Kansas has established "a very high standard for the common law tort of intentional infliction of emotional distress."[192] Furthermore, Kansas courts have been reluctant to extend the outrage cause of action to discrimination and other types of employment claims.[193] Consequently, in the employment context, "[t]he overwhelming majority of Kansas cases have held in favor of the defendants on the outrage issue, finding that the alleged conduct was insufficiently 'outrageous' to support the cause of action.' "[194].

■ To establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show: (1) the defendant's conduct was intentional or in reckless disregard of the plaintiff; (2) the defendant's conduct was extreme and outrageous; (3) the existence of a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress is extreme and severe.[195]

■ To resolve a motion for summary judgment on an intentional infliction of emotional distress claim, the court must determine, as a threshold matter that (1) the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) the emotional distress suffered by the plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it.[196] Conduct is not

192. *Glover v. NMC Homecare, Inc.*, 106 F.Supp.2d 1151, 1170 (D. Kan.2000) (quoting *Dunegan v. City of Council Grove, Kan.*, 77 F.Supp.2d 1192, 1208 (D.Kan.1999)).

193. *Bolden v. PRC Inc.*, 43 F.3d 545, 554 (10th Cir.1994).

194. *Glover*, 106 F.Supp.2d at 1171 (quoting *Wood v. City of Topeka, Kan.*, 90 F.Supp.2d 1173, 1194 (D.Kan.2000)).

195. *Bolden*, 43 F.3d at 553 (applying Kansas law).

196. *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1264 (10th Cir.1998) (citations omitted).

extreme and outrageous unless it is considered as "beyond the bounds of decency and utterly intolerable in a civilized society."[197] "This decidedly difficult threshold has been maintained so that worthy claims may be separated from those based on trivialities or hyperbole."[198]

■ The Court has carefully considered the factual basis for this claim and finds it does not rise to the necessary level. The alleged actions taken by the County are more akin to the kind of "ordinary business decisions ... made every day ... across the nation" as opposed to what a civilized society would call "atrocious, indecent, or utterly intolerable."[199] The alleged conduct of the County cannot reasonably be regarded as so extreme and outrageous that it goes beyond the bounds of decency or is utterly intolerable in a civilized society.

Having found this threshold element of Plaintiff's outrage claim to be lacking, the Court must grant the County summary judgment on this claim.

## IV. Conclusion

None of Plaintiff's claims is anything more than a workplace dispute among Plaintiff and her supervisors and co-workers. As the Court has explained, not all workplace disputes support claims for legal relief. It is for the reasons set forth above that the Court granted Defendant's Motion for Summary Judgment (doc. 81) in its September 30, 2002 Order (doc. 154).

**IT IS SO ORDERED.**

---

**197.** *Id.* (quoting *Moore v. State Bank of Burden*, 240 Kan. 382, 729 P.2d 1205, 1211 (1986)).

**198.** *Dunegan v. City of Council Grove, Kan.*, 77 F.Supp.2d 1192, 1208 (D.Kan.1999) (internal quotations and citations omitted).

**199.** *Deghand v. Wal–Mart Stores, Inc.*, 926 F.Supp. 1002, 1019 (D.Kan.1996) (quoting *Anspach v. Tomkins Indus., Inc.*, 817 F.Supp. 1499, 1508 (D.Kan.1993), *aff'd without op.*, 51 F.3d 285, 1995 WL 133385 (10th Cir.1995)).